MAHASKA COUNTY STATE BANK v. JAMES A. BROWN and THEODOSIA J. G. BROWN, Appellants.

**Mortgages:** CONSIDERATION: FAILURE: EVIDENCE. Where a portion of the debt of an assignor for the benefit of creditors was secured by a mortgage on the homestead of the debtor, the remainder being unsecured, the agreement of a creditor to use his influence to induce the assignee to sell a stock of goods embraced in the assignment at retail, so as to pay the debts, if possible, without resorting to the homestead, was not a consideration for the contract of the assignor and his wife that the mortgage on the homestead should also stand as security for the unpaid portion of the unsecured debt, even though the contract was in writing. And if, as contended by plaintiff, the agreement provided that the creditor should furnish the assignee with funds to carry on the business with the hope of paying the debts therefrom, such a consideration failed when the assignor was thrown into involuntary bankruptcy by other creditors, and the stock of goods passed from the hands of the assignee. The evidence in this case is held to show either a want of consideration, or a failure thereof.

**Contracts:** IMPOSSIBILITY OF PERFORMANCE: EXCUSE. Ordinarily a contingency arising which might have reasonably been anticipated and provided against will not excuse the performance of a contract; but where the impossibility of performance arises from a contingency which could not, in the exercise of reasonable prudence, have been provided against, and happening without the fault of either party, performance is excused.

VOL. 159 IA.—37

**Mortgages:** CONSIDERATION: EVIDENCE. In this action to foreclose
3  mortgages, in which it was claimed that an alleged agreement of
the mortgagors that the same should stand as security for other
indebtedness was without consideration, the evidence is held insuf-
ficient to show an agreed extension of the time of payment as a
consideration for the contract.

**Bankruptcy:** DIVIDENDS: APPLICATION BY CREDITOR. The creditor of
4  a bankrupt, whose claim is partly secured by mortgage and partly
unsecured, may credit a dividend allowed on the whole indebtedness
upon that portion which is unsecured, in the absence of a showing
of bad faith on the part of the creditor. In the instant case the
application of the whole dividend to the unsecured portion of the
debt was proper.

*Appeal from Mahaska District Court.*—HON. B. W. PRES-
TON, Judge.


FRIDAY, MAY 16, 1913.


SUIT to foreclose certain mortgages resulted in decree as
prayed. The defendants appeal.—*Modified.*

*McCoy & McCoy* and *S. V. Reynolds,* for appellants.

*John F. & Wm. R. Lacey,* for appellee.


LADD, J.—Plaintiff held two notes executed to it by the
defendants, one for $1,500, dated April 30, 1907, and pay-
able five years thereafter, and the other for $2,500, dated
September 15, 1908, and payable six months after date.
Each note was secured by mortgage on the ten-acre home-
stead of defendants belonging to and in the name of Mrs.
Brown. Interest on these was paid until October 30, 1910,
but no part of the principal, and on September 26, 1910, the
parties entered into a contract which, after reciting the
parties and the execution of the above mortgages "upon said
real estate claimed as a homestead by the party of the first
part [defendants]," describing it, proceeded:

And whereas, the said James A. Brown is indebted unto the said second party [plaintiff] in the sum of about $7,200 in addition to the said sum of four thousand dollars secured by said mortgages; and whereas, said sum so secured by the said mortgage and the said additional sum of about $7,200.00 are owing unto the said second party by the said James A. Brown; and whereas, the said James A. Brown has made a general assignment for the benefit of his creditors, which assignment does not include the said homestead; now for a valuable consideration, the first party agrees that when the said assignment shall be settled and adjusted that for any amount that may remain unpaid upon the amount secured by the said mortgages the said mortgages shall still remain as security therefor, after crediting any dividends or payments that may be paid thereon by the assignee, and that the said mortgages shall both also stand as security for any balance that may remain unpaid upon the account or debt of said James A. Brown unto the second party not originally secured by the said two mortgages; in the event of the foreclosure of said mortgages the said property embraced described in said mortgages shall be held for any balance unpaid of the debt of the said James A. Brown unto the second party, and such sum shall be embraced in any judgment or decree of foreclosure of said mortgages, this contract being intended as an additional mortgage to that extent.

Prior to its execution plaintiff had been pressing Brown for payment of at least a part of the $7,200, and largely because of this he had executed an assignment for the benefit of creditors. His property consisted of a stock of goods, and the assignee operated the store for about a month when proceedings in bankruptcy were instituted by other creditors, the property taken by a trustee, and the estate settled in the federal court. The plaintiff filed its claim for the entire indebtedness with the referee in bankruptcy. It was allowed, and a dividend of 42 per cent realized thereon, and this applied on the $7,200, leaving about $2,416 unpaid. The plaintiff in this suit prayed for judgment against defendant for the amounts owing on the notes first mentioned and this balance,

and for the foreclosure of the mortgages securing the same and the contract.

The defenses interposed were that the consideration of the contract failed, or there was no consideration: (1) That $1,680 was allowed plaintiff by the bankruptcy court on the two notes, and Mrs. Brown was entitled to a credit thereon for such amount; and (3) that James A. Brown had been discharged in bankruptcy, so that no judgment might be rendered against him. The last defense was sustained, and the ruling is not questioned on this appeal. The main contention of appellants is that the contract was without consideration, or that this had failed. The answer sets up that it was executed in pursuance of an oral agreement that "the bank would take care of said James A. Brown, that it would assist to restock his store for the fall and spring sales, and that, in case the said stock was not sufficient to pay all the obligations of the defendant," then the instrument was to be enforced, and Mrs. Brown would become liable for whatever the property lacks of paying the debts; that soon thereafter Brown was forced into bankruptcy, and the contract then and there became null and void, there being no consideration for the execution of the contract; and defendants now plead the fact that "said instrument or its terms were not carried out or ever attempted to be carried out, and that there was a total failure of consideration." The agreement being in writing imports a consideration, but it contains no intimation of what it was. Nothing is undertaken by the plaintiff. It merely recites that the mortgages shall remain security for the balance of the indebtedness after crediting any dividends derived through the assignment, and also for the balance of the personal indebtedness of James A. Brown, and that in event of foreclosure, the property mortgaged shall be held therefor and embraced in the decree of foreclosure, but in no manner, either expressly or by fair implication, extends the time of any obligation of the defendants. For all that appears in the contract action might have been begun on any of the

notes or other indebtedness of either or both defendants immediately, and what should be done in event of foreclosure is stipulated. Indeed it is so drawn as to bind defendants without imposing any obligation whatever on the bank.

I.   Turning to the evidence, we find several versions as to

1. MORTGAGES:
consideration:
failure: evidence.

how Mrs. Brown came to sign the contract. The vice president of the bank, H. S. Howard, who appears to have handled the matter for it, testified:

I told her that I wanted to talk to her and her husband together, and if they would come to the bank that evening at 7:30 I would have a talk with them. They came into the bank, and I said, 'I want to know how you feel towards the bank.' And Mrs. Brown said she expected them to get their money. I said: 'If this assignment is correct—Mrs. Brown's statement of the property is correct—you will have enough to pay the debts. If there is not enough, after what we have done we feel we ought to be protected.' She said she wanted us protected. I said, 'I have an instrument here,' which I read to her, and told her what it meant—that if we didn't get out our $7,500 unsecured indebtedness that we would look to the homestead—and she said if she lost the homestead on that, she would lose it and feel all right about it, because we had been a wonderful help to her husband in getting him out of the slough he was in. . . .   The inventory showed $16,000 worth of merchandise and $9,700 or $9,800 in accounts, and they owed $5,000 or $6,000 outside of the bank, something like $13,000 or $14,000 outside [including] of the bank's claim. It was our understanding—I told Mrs. Brown at the time—it was our desire to make our money, including the $4,000 mortgages, out of the assets of her husband and not to disturb the homestead. There was one note of $2,500 that had been due some eighteen months, and we were not seeking to foreclose the debt, but we were carrying it along until this matter was adjusted. We held our foreclosure back until the bankruptcy and assignment had been closed. . . .   She said at the time the contract was signed that she was under obligations to the bank for the reason that they had made a man out of her husband—he was drinking very hard, and through our influence we could use, he was induced to go

to a sanitarium, and he came back a cured man of the drink habit, and she felt under obligations—she wanted to secure the bank the entire claim; that was the talk with Mrs. Brown at that time. Q. And you were to go ahead, after she signed this, and in consideration of her signing it, this store was to be continued? A. Continued under the assignment to pay out his debts? Q. Yes; and you was to advance the money for the store, and run the store and pay all the creditors out? A. No; I didn't understand we could advance money to an assignee. He had made an assignment to Mr. Boyer. Mr. Boyer was the assignee. Q. The contract is that the first party agrees that when said assignment shall be settled and adjusted that for any amount that may remain unpaid upon the amount secured by the said mortgages the said mortgage shall still remain as security therefor. Now the idea of that was this: That you was to advance money, and the store was to continue and you folks was to get your money out of it, in that way? A. That's the understanding under the assignment that the store was to run along. Q. Yes; and that was the reason Mrs. Brown gave you this mortgage, or contract, this contract? A. That was the condition at the time that contract was given. Q. Now the fact is, that shortly after this assignment to the creditors was made, Mr. Brown was forced into bankruptcy, was he not? A. Yes, sir. Q. And these proceedings were dismissed here in this court, in other words, were transferred to the federal court, and they finished up the business? A. Yes, sir.

Mrs. Brown's account of the transaction is as follows:

The object in making the assignment was to pay off the debts and get the business straightened out. Well, Mr. Howard told me, it was our intention (that's the way he always put it) to have the business continued, to supply what goods was necessary to keep the stock in a salable condition for the spring and fall trade, and they thought that would finish it up by the time the spring sales were over; that there would be enough money brought in to pay off this indebtedness, and that was all. Then of course they said they would turn the store back to Jim after that, after getting their debts paid. Q. Tell the court what the contract was, or the understanding that you had of the contract when you signed it. A. Well,

there was just Mr. Howard and my husband and myself in the room; do you want the conversation as well as I can remember it? Q. Yes. A. Well, when we went in Mr. Howard told me—we had talked about this furnishing goods, you know, and carrying on the selling and liquidating these debts —and he says, 'Now, Mrs. Brown, there will be no use of you getting an attorney at all,' he says, 'Mr. Lacey, if we need an attorney, can attend to it,' and he says: 'Of course we intend to do this to favor you, and under these circumstances we want an agreement with you people. We let you in by it, after we have furnished the goods to you,' etc. Q. To the assignee? A. Yes; that then they would take the property. . . . Q. You say the assignee was to go and run the store? A. Yes, sir. That still was to go on, and of course he told me they intended to employ my husband there; that he would be there to see in regard to it and help with the sale. Frank Boyer was assignee; he was to run the store and pay the debts. He led me to believe that my husband would have the managing of the store, and I agreed then that the homestead could go in. . . . Under the assignment the bank was to furnish the fall and spring stock of goods and whatever was necessary to run the store.

She testified further that when the goods were taken over in the bankruptcy proceedings, the vice president said to her that all creditors would be on the same footing, and later that the contract was of no consequence.

The vice president denied having said anything to Mrs. Brown about the effect of the proceedings in bankruptcy on the contract, and also denied having agreed to furnish money to restock the store. The son of the vice president, Charles Howard, testified that he heard all the conversation, and that nothing was said concerning Brown managing the store, nor about the bank furnishing money to operate it, and that his father asked Mrs. Brown if she understood the meaning of this contract, and read it over.

She said, 'Yes; I would be glad to do anything for the bank, and I want to protect them because they have been very kind to my husband, and I would rather lose my home than

lose my husband—they saved my husband.' Father also said, 'Of course, Mrs. Brown, we hope not to have to use this measure of taking your home, but at the same time, of course, there is a possibility there,' and asked if she understood it, and she said she did. Then he said, 'If the stock pays out it will not be necessary to use this; this will be used in an extremity to protect ourselves. Of course we would withhold any action until after the business was wound up, and if there was a deficiency, fall back on this contract.' (Cross-examination): Mr. Boyer was the assignee. The contract there is the contract that was made that night; father said the mortgage would be left alone until the business was straightened up. I was not very familiar with the business; it was not in my line of work. I do not know whether this contract was drawn before or after the assignment. It says it was after the assignment. Father gave Mrs. Brown to understand that if there was a shortage in the assignment he would foreclose the mortgage.

The evidence bearing on the consideration for the execution of the contract has been set out fully, for the reason that as we think it demonstrates either that there was none or that it has failed. According to Howard, the latter parted with nothing, save possibly to use its influence in inducing the assignee to close out the stock at retail. But, as both parties are presumed to have known, the bank was without power to control the management of the stock, or to have Brown employed by the assignee, and any such undertaking would not render it liable.

The assignee, though designated by the assignor, acts under the supervision of the court, and the property, upon the due execution of the assignment, becomes *in custodia legis.* *Hamilton-Brown Shoe Co. v. Mercer,* 84 Iowa, 537.

But the witness does admit having pointed out how the stock of goods would be managed, and to have held out the hope that it might be sufficient to discharge her husband's debts, and that in this event only would it be necessary to resort to the homestead under the contract. It is not easy to understand how all this might be done with replenishing

the stock somewhat, and the account of Mrs. Brown is the more reasonable. But if her testimony were accepted, the plaintiff is no better off, for through no fault of either party, the consideration failed.

Whether, in view of the property being in *custodia legis* a promise to a third person to furnish the assignee money to carry on the business would be a sufficient consideration for such a contract need not be considered, as the proposition is not argued. It is enough to say that the undertaking of the bank to furnish the assignee money to continue the business was rendered impossible of performance by the proceedings in bankruptcy and the taking over of the property by the trustee. The parties contracted on the basis that the assets of the estate would continue in the hands of the assignee, and necessarily there was to be implied therefrom the condition that if these were entirely removed therefrom without fault of either party, as by the institution of bankruptcy proceedings, performance would be excused. This was not a condition against which, in the exercise of ordinary prudence, the parties could be expected to have provided.

Ordinarily a contingency which reasonably may have been anticipated must be provided for by the terms of the contract, else the impossibility of performance resulting therefrom will not excuse either party from carrying out the contract. But where an event would not, in the exercise of ordinary prudence, have been provided against, if it happen without the fault of either party, the impossibility of performance resulting therefrom will excuse liability for a breach of the contract.

2. CONTRACTS: impossibility of performance: excuse.

We have discovered no case exactly in point, but the principle has often been recognized. *Lehigh Zinc, etc., Co. v. Trotter,* 42 N. J. Eq. 678 (9 Atl. 691); *Walker v. Tucker,* 70 Ill. 527; *Atkinson v. Schoonmaker,* 12 Mo. App. 425; *People v. Ins. Co.,* 91 N. Y. 174; *Malcomsom v. Wappoo Mills* (C. C.) 88 Fed. 680. See *Gould v. Murch,* 70 Me. 289 (35

Am. Rep. 325); *Dexter v. Norton,* 47 N. Y. 62 (7 Am. Rep. 415). This rule excusing performance is analogous to that relating to failure to perform owing to natural causes. *Ward v. Vance,* 93 Pa. 499; *Brick Co. v. Pond,* 38 Ohio St. 65; 2 Elliott on Contracts, section 224; Benjamin on Contracts, 330; 9 Cyc. 629.

All liability on the part of the bank having ceased before there was any performance of its undertaking, the very consideration on which the execution of the contract was based, according to Mrs. Brown, failed. *Simpson Centenary College v. Bryan,* 50 Iowa, 293; *Morrow v. Hanson,* 9 Ga. 398 (54 Am. Dec. 346).

Nor, though not pleaded, does the record warrant a finding that there was a consideration in extending the time of payment of the existing mortgages. The bank had not been pressing the collection of these. The interest had been kept up, and payment thereof formed no part of the discussion. True the vice president related that, "There was one note for $2,500, that had been due some eighteen months, but we were not seeking to foreclose it . . . until this matter was adjusted." This merely recited what the bank was doing, and does not purport to be any part of the arrangement with Mrs. Brown. The only other testimony having any bearing on this feature of the case is that of Charles Howard, but his evidence as a whole cannot fairly be interpreted to mean that as a consideration for the contract the time for the payment of the mortgages was to be extended. His father made no such claim, and Mrs. Brown in testifying to what the agreement was negatives any such inference. The conversation to which he testified related to the contract, and if action was to be deferred, it was on this. Nothing he relates can fairly be construed to bind the bank to forbear suing Brown on his debt nor to postpone its maturity. As all Brown's property was in the hands of the assignee and any action against him would have been nugatory, the matter of extending the time for

3. MORTGAGES: consideration: evidence.

payment of his indebtedness was of no consequence and was not a subject of discussion. As appears from his evidence as a whole, especially when compared with that of his father, by mortgage he had reference to the contract, which was in the nature of a mortgage, and is referred to therein as "being intended as an additional mortgage." As plainly appears from the testimony of H. S. Howard, the action he undertook to withhold was on the contract, and not the indebtedness it purports to secure, and a promise of forbearance to sue on a contract cannot operate as a consideration for its execution. Upon the application of the dividend received in bankruptcy proceedings, the bank charged the unpaid balance of the $7,200 off its books as unavailable profits and loss. On no theory then can the action on the contract be maintained; for, according to plaintiff's witnesses, it was without consideration, and if there was consideration, as testified to by Mrs. Brown, whose version of the transaction seems the more probable and, as we think, is true, it failed.

II. The plaintiff filed its claim of $11,200, being the indebtedness of $7,200 owing by Brown alone and the $4,000 secured by mortgages on the homestead, with the referee in bankruptcy, was allowed a dividend of 42 per cent thereon, and applied the same on the $7,200. Appellants argue that the amount *pro rata* allowed on the $4,000 should have been applied on that indebtedness. As the claim was for an indebtedness of Brown and allowed as such, the bank, in the absence of any showing to the contrary, might apply the same as it chose, and that of course would be on the unsecured indebtedness. Mrs. Brown testified that Howard requested her to go to the office of the bank's attorney and have the claim for the $4,000, which she had secured by these mortgages on her homestead, made out and filed with the referee in bankruptcy for the bank's claim therefor, because there would be objection to declaring a dividend thereon in favor of the bank. She did so, and the claim was filed. No dividend was declared thereon. The attorney

4. BANKRUPTCY: dividends: application by creditor.

testified that he suggested this course so that, if the bank's claim were not allowed, Mrs. Brown's would be. The creditors interposed no objections to the bank's claim, and even though this omission may have been due to the filing of Mrs. Brown's claim, the record is without evidence of bad faith on the part of the bank or attorney, and the bank might properly credit the amount received on the indebtedness as it might elect.

The decree will be modified by eliminating the indebtedness of Brown other than that secured by the mortgages, and as so modified is *Affirmed*.

PRESTON, J., takes no part.