Roland JOHNSON, as Trustee of the Ben P. St. John Trust, and Roland Johnson, Robert Mickey, and Lester Mealiff as Trustees of the Adeline G. St. John Trust, Appellees,

v.

Joe w. DODGEN and Iowa Growthland Financial Corp., Appellants.

No. 88–1466.

Supreme Court of Iowa.

Jan. 24, 1990.

Diane M. Stahle of Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, for appellants.

Lawrence P. McLellan and Robert A. Sims of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellees.

Considered by CARTER, P.J., and LAVORATO, NEUMAN, SNELL and ANDREASEN, JJ.

LAVORATO, Justice.

This breach of contract action is the aftermath of a bank failure caused by the embezzlement of $16.7 million by Des Moines stockbroker Gary Lewellyn. In 1967 Joe W. Dodgen agreed to buy controlling interest in the First National Bank of Humboldt under a stock purchase agreement (agreement) calling for monthly payments. Ben P. and Adeline G. St. John, the sellers, died shortly thereafter. Two trusts were then established to receive payments under the agreement.

Dodgen assigned the agreement to his company, Humboldt Realty Insurance Co., Inc. Humboldt Realty, which was not in existence at the time the agreement was executed, underwent several name changes until it became known as Iowa Growthland Financial Corporation. After the bank was closed in 1982, Iowa Growthland continued to make payments under the agreement until 1984.

The trusts then sued Dodgen and Iowa Growthland for the payments that were in arrears. Dodgen and Iowa Growthland filed an answer in which they raised failure of consideration as an affirmative defense. Simply put, they were claiming that the consideration for the agreement failed when the bank went out of existence. In addition, Dodgen asserted that he was not personally liable because he signed the agreement as an agent for Humboldt Realty. In its counterclaim, Iowa Growthland sought damages on the theory of unjust enrichment for payments it made after the bank was closed.

The case was tried to a jury. By way of answers to special verdict forms, the jury found that the trustees were not entitled to recover for breach of contract, that Dodgen was indeed acting as an agent when he signed the agreement, and that Iowa Growthland was not entitled to damages for its claim of unjust enrichment. See Iowa R.Civ.P. 205.

The district court granted a new trial on all the issues. Dodgen and Iowa Growthland appealed; the trustees cross-appealed.

We reverse and remand with directions to enter judgment in favor of the trustees pursuant to Iowa Rule of Appellate Procedure 26.

Following trial, the trustees moved for judgment notwithstanding the verdict or new trial. The trustees alleged they were entitled to a judgment notwithstanding the verdict because the district court should have sustained their motion for directed verdict on all the issues. The trustees requested, in the alternative, a new trial.

In its ruling the district court said:

In viewing the evidence most favorably to the defendants, it is clear that the defense of failure of consideration should not have been submitted. The court should have directed a verdict at the close of the evidence to the effect that the contract was enforceable and the parties were not relieved from their obligations. However, other issues exist which make it difficult for the court to enter judgment. Dodgen claimed at trial that he was merely an agent at the time he executed the contract and the jury so found pursuant to a [special verdict]. However, new trials are generally granted as to the whole case and on all issues. Moreover, once the jury in this case determined that Plaintiffs were not entitled to recover under the contract, they should not have further determined the

agency issue. Also, the jury never determined Growthland's liability. The whole verdict must be set aside.

The trial court has inherent power to grant a new trial when the verdict does not effect substantial justice between the parties. The court earnestly believes this is a case for a new trial, with proper legal instruction.

On appeal, Dodgen and Iowa Growthland contend the district court erred when it granted a new trial on their failure of consideration defense. In support of their contention, Dodgen and Iowa Growthland urge three reasons why there was sufficient evidence to submit the defense. First, they contend the very essence of the agreement—the bank—ceased to exist. Second, they contend the agreement was still executory when the bank was closed because the trustees had not, before that time, delivered the stock. The trustees were holding the stock as security pursuant to the agreement. Last, they contend they did not have full ownership of the stock when the bank was closed because they could not pledge the stock as security for borrowing purposes.

Dodgen and Iowa Growthland raise two additional issues. Iowa Growthland contends that we should overturn the jury's verdict on its unjust enrichment counterclaim and enter judgment in its favor for all payments it made after the bank was closed. Dodgen challenges the district court's posttrial ruling that granted the trustees a new trial on the agency issue. He argues that the jury's verdict on this issue should stand.

The trustees in their cross-appeal contend that the district court erred when it did not direct a verdict in their favor on all three issues. So they argue that the district court should have sustained their motion for judgment notwithstanding the verdict on these issues.

■ The district court granted a new trial because the court believed it had committed several legal errors that resulted in a failure to effectuate justice between the parties. In these circumstances our scope of review is for errors at law rather than

for abuse of discretion. *See* Iowa R.App.P. 14(f)(4); *Julian v. City of Cedar Rapids*, 271 N.W.2d 707, 709 (Iowa 1978); *Kessel v. Hunt*, 215 Iowa 117, 123, 244 N.W. 714, 716 (1932); *Hubbard v. Bartholomew*, 163 Iowa 58, 63, 144 N.W. 13, 15 (1913).

■ A judgment notwithstanding the verdict must stand or fall on the grounds stated in the motion for directed verdict. On appeal, our review is limited to those grounds. *Watson v. Lewis*, 272 N.W.2d 459, 461 (Iowa 1978).

When considering a motion for judgment notwithstanding the verdict, the district court must view the evidence in the light most favorable to the party against whom the motion is directed. *Id.* at 461. In reviewing the propriety of the district court's ruling on such a motion, we also view the evidence in the same manner. Simply put, we ask, was there sufficient evidence to generate a jury question? *Id.* at 463. These are the same principles that the district court is bound to follow on a motion for a directed verdict. *Id.*

■ Under this view of the evidence, if there is substantial evidence to support the claim or defense, the motion for directed verdict or for judgment notwithstanding the verdict should be denied. Conversely, without such evidence, a directed verdict or judgment notwithstanding the verdict is appropriate. *Valadez v. City of Des Moines*, 324 N.W.2d 475, 477–78 (Iowa 1982). Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion. *Briggs v. Board of Directors of Hinton Community School District*, 282 N.W.2d 740, 743 (Iowa 1979).

With these principles in mind, we turn to the three issues raised in this appeal. We first consider the failure of consideration issue, and then the unjust enrichment and agency issues.

*I. Failure of Consideration.*

Dodgen and Iowa Growthland contend that the continued existence of the bank was the essence or root of the agreement— the thing Dodgen really bargained for. They argue that when the bank was closed

the consideration for Dodgen's promise to pay failed. This failure of consideration, they assert, excused any future performance on their part.

■ There is a difference between lack of consideration and failure of consideration. A lack of consideration means no contract is ever formed. In contrast, a failure of consideration means the contract is valid when formed but becomes unenforceable because the performance bargained for has not been rendered. Failure of consideration

> covers every case where a contractual obligation is not performed irrespective of the fault of the breaching party. Thus, a failure of consideration may describe nonperformance which does not constitute a breach. A failure to render a promised performance may not be a breach of contract for the reason that performance has become impossible without fault; but is nonetheless a failure of consideration discharging the other party from his duty to perform under the contract, giving him the right to the restitution of payments already made or other benefits conferred.

*First Nat'l Bank of Belfield v. Burich*, 367 N.W.2d 148, 153 n. 3 (N.D.1985) (citation omitted). *See also Kristerin Dev. Co. v. Granson Inv.*, 394 N.W.2d 325, 331 (Iowa 1986); 6 Williston, Contracts, § 814 (3d ed. 1962); 6 Corbin on Contracts, § 125 (1964); Restatement (Second) of Contracts, § 237 comment a (1981).

■ To constitute a complete defense to a breach of contract claim, the alleged failure of consideration must be total. *Burich*, 367 N.W.2d at 153 n. 3; *accord Kristerin*, 394 N.W.2d at 331. A total failure of consideration occurs when a party has failed or refused to perform a substantial part of what the party agreed to do. In these circumstances the failure or refusal to perform defeats the very purpose of the contract. *Burich*, 367 N.W.2d at 153. Our statute recognizes total failure of consideration as a defense. Iowa Code § 537A.3 (1983).

**A. Essence of the agreement.**

■ Under the agreement here, Dodgen agreed to purchase from St. John 506 shares of capital stock of the bank. The 506 shares represented 50.6% of the issued and outstanding stock of the bank. By this purchase, Dodgen was acquiring controlling interest in the bank.

For the 506 shares Dodgen agreed to pay a net price of $683,400 as follows: $125,000 down and the balance payable with interest at 4½% per annum. Dodgen's first principal payment was not due until July 1, 1972 —five years following the execution of the agreement. On this date Dodgen was to begin making monthly payments of $2000 on the principal, plus accrued interest.

Besides selling his stock, Ben St. John agreed to include, as additional consideration, his one-third interest in an insurance agency. He also agreed to (1) resign as president and a director of the bank, (2) require his wife, Adeline, to resign as a director of the bank, (3) request the bank board of directors to elect Dodgen to such office as Dodgen desired, (4) use his influence with all bank employees to keep them employed in the organization, and (5) not to engage in the banking or insurance business in Humboldt or within a radius of 50 miles of such town for five years.

The agreement also included the following provision:

> It is the understanding and agreement that the seller will retain in his possession said shares of stock until such time as the buyer may pay for same, with the exception that the buyer may exercise all ownership rights on the stock unless specifically denied by the seller due to buyer's default on the terms of this contract.

Dodgen and Ben St. John signed the agreement on July 3, 1967. The following month the 506 shares were registered in Dodgen's name. Ben St. John had owned 376 of those shares and Adeline had owned 130. In addition, Ben and Adeline relinquished their positions as members of the board of directors; Dodgen was installed as board chairman and president of the bank. From this point on Dodgen was in control of the bank. Later Clifford Lewel-

lyn became the bank's president; as president he had the responsibility for the day-to-day operations of the bank.

All of the other promises Ben St. John had made he performed. He transferred his one-third interest in the insurance company to Dodgen and kept his agreement not to compete. As the agreement permitted, St. John kept physical possession of Dodgen's stock to serve as collateral for Dodgen's remaining obligations.

In February 1968 Ben St. John died. Because his will was declared invalid, a trust was established to receive payments under the agreement. Roland Johnson, one of the plaintiffs, was appointed trustee of this trust.

Adeline also died. Under her will a charitable trust was established. This trust was partly funded by proceeds from the sale of her 130 shares of stock to Dodgen. Robert Mickey and Lester Mealiff—the other plaintiffs—together with Roland Johnson were appointed trustees of the charitable trust.

Dodgen assigned his rights to the 506 shares of stock to his corporation, Humboldt Realty. Humboldt Realty later changed its name to First Investors Services, Inc., which in turn changed its name to Iowa Growthland Financial Corp.

In the spring of 1982 banking authorities discovered that Gary Lewellyn—the bank president's son—had embezzled $16.7 million from the bank. The Federal Deposit Insurance Corporation determined the bank was insolvent and closed it.

Iowa Growthland continued to make payments under the agreement for two years after the bank was closed. Iowa Growthland ceased making payments in January 1984 because it had run out of money.

Viewing this evidence in the light most favorable to Dodgen and Iowa Growthland, we think reasonable minds would not differ as to the following facts. The essence of the agreement was not—as Dodgen and Iowa Growthland contend—the continued existence of the bank. Rather, it was the controlling interest in it represented by the 506 shares of stock Dodgen purchased. It would be unreasonable and illogical to presume that Ben St. John was intending to guarantee the continued solvency and success of the bank. Yet that is the kind of reasoning underlying the contention that the continued existence of the bank was the essence of the agreement.

In our view the potential failure of any business that is being sold is always a risk in the contemplation of the parties. If the buyer wants protection against this risk, the simple solution is to hedge against it in the agreement. That was not done here. Consequently, Dodgen assumed that risk.

What Dodgen bargained for was control of the bank through the stock he purchased; he got it and had it for fifteen years. The fact that his investment later turned out worthless does not, in our view, constitute failure of consideration.

One telling piece of evidence belies Dodgen's professed belief that the continued existence of the bank was the essence of the agreement. In a letter dated April 19, 1982, to one of the trustees, Dodgen acknowledged that the underlying asset in the agreement was the stock he purchased. This is considerably different from what he now claims to be the underlying asset in the agreement: the continued existence of the bank.

*Cotner College v. Hester's Estate,* 155 Neb. 279, 51 N.W.2d 612 (1952) and *Simpson Centenary College v. Tuttle,* 71 Iowa 596, 33 N.W. 74 (1887)—two cases Dodgen and Iowa Growthland rely on heavily—are distinguishable. Both were attempts by colleges to collect on subscription notes. And in both instances the colleges attempted to use funds from subscription donations for purposes other than for what the subscription notes were originally given. Such a substitute in performance constituted, according to both courts, a failure of consideration. No such substitute in performance occurred here.

B. The executory nature of the agreement.

■ This issue is inextricably intertwined with the essence of the agreement issue. Dodgen and Iowa Growthland con-

tend that the agreement was still executory when the bank was closed because the trustees had physical possession of the stock. While the trustees are still able to turn over the stock, Dodgen and Iowa Growthland argue such a gesture would be meaningless because the asset that the stock represents is nonexistent. So, they argue, there was a failure of consideration when the bank was closed.

This argument is predicated on a rule of law that excuses performance when the subject matter of a contract is destroyed. Dodgen and Iowa Growthland rely heavily on this rule and cite in support of it the Restatement (First) of Contracts section 281 (1932). Section 281, entitled, "Prospective Inability of One Party Caused by Destruction of Subject–Matter," provides that

> [i]n promises for an agreed exchange, a promisor is discharged from the duty of performing his promise if substantial performance of the return promise is impossible because of the nonexistence, destruction or impairment of the requisite subject-matter or means of performance....

See also *Wood & DuVall v. Iowa Bldg. & Loan Ass'n*, 126 Iowa 464, 470–71, 102 N.W. 410, 411–12 (1905); *Mahaska County State Bank v. Brown*, 159 Iowa 577, 585–86, 141 N.W. 459, 462 (1913).

Comment c to section 281 significantly provides that

> a seller of goods [who] retains a lien or a title merely for the purpose of security [is entitled to receive the purchase price although the goods are destroyed.] [Such a case], however, [is] not [an exception] to the rules stated in [section 281,] *since when recovery of the price is allowed, the result is based on the premise that the substantial incidents of ownership had already passed to the buyer before the destruction.*

(Emphasis added.) The italicized language is another way of saying that failure of consideration is not available as a defense to the buyer because the seller has substantially performed.

Similarly here the substantial incidents of ownership to the stock had already passed to Dodgen before the bank was closed. Dodgen and St. John expressly acknowledged this in the agreement which clearly recognized that Dodgen could exercise all ownership rights in the stock. The stock was reissued in Dodgen's name; St. John merely held the stock as security for Dodgen's promise to pay.

For all intents and purposes St. John did everything essential to an executed sale except to surrender physical possession of the stock to Dodgen. *Cf. Hull–Dobbs Motor Co. v. Associates Discount Corp.*, 241 Iowa 1365, 1368–69, 44 N.W.2d 403, 406 (1950) (recognizing that a conditional sales contract divides itself into two parts: one of a fully effected sale and one of a provision for securing payment). St. John had to retain possession to establish his security interest in the stock as the agreement allowed him to do. Under our law that was the proper way to perfect a security interest in the stock. *See* Iowa Code §§ 554.-9305, 554.9105(1)(i), 554.8102(1).

■ Even though a seller retains physical possession of the stock as collateral under a stock purchase agreement, there may be constructive delivery of the stock from the seller to the buyer. *Cf. In re Application of Stewart Becker, Ltd.*, 94 Misc.2d 766, 772, 405 N.Y.S.2d 571, 575 (1978) ("Although a transfer of stock requires delivery (U.C.C. § 8–309), title may pass by constructive delivery and, if the parties so intend, title passes to the buyer by delivery to an escrow agent for ultimate delivery to the buyer upon payment of the purchase price or part thereof."); *accord Banker's Trust Co. v. Rood*, 211 Iowa 289, 233 N.W. 794 (1930). Constructive delivery occurs when the buyer does not retain physical possession of the stock but is entitled to full voting rights as well as dividends. *In re Application of Stewart Becker, Ltd.*, 94 Misc.2d at 772, 405 N.Y. S.2d at 575.

■ Once constructive delivery takes place, the defense of failure of consideration becomes inapplicable. This is so because consideration must be ascertained on the day of sale. *Herrmann & Henican v.*

*De La Perriere,* 47 Ga.App. 541, 171 S.E. 232, 233 (1933). So, a subsequent

> depreciation [in the value of the stock] would give the defendant no greater right to avoid his obligation to pay the stipulated price for the property than an enhanced value would give the plaintiff an excuse for the nonfulfillment of his agreement.

*Id.*

Here we think the parties intended title to the stock to pass to Dodgen once the stock was registered in his name. At this point several things had occurred. Dodgen had made the down payment called for in the agreement and began exercising control of the bank. Likewise, St. John had substantially performed his part of the agreement. Only two promises remained unperformed: Dodgen's full payment of the purchase price and St. Johns' delivery of physical possession of the stock.

In these circumstances, we think there was a constructive delivery of the stock to Dodgen. Although the collateral provision of the agreement denied Dodgen physical possession of the stock, it did give him the right to such possession upon full payment. The provision also gave him rights of ownership in all other respects. Risk of loss passed with this constructive delivery. The decline in the stock's value gave Dodgen no greater right to avoid his obligation to pay than an enhanced value would have given St. John an excuse for not delivering the stock.

C. Inability to pledge the stock as security.

■ It is true that under the agreement Dodgen could not borrow against the stock. Dodgen and Iowa Growthland assert this constraint as further evidence that consideration for the agreement failed: The short answer to this argument is that Dodgen should not be allowed to take advantage of a provision he agreed to.

These three facts—the bank's closing, Dodgen's lack of physical possession of the stock, and Dodgen's inability to pledge the stock as collateral—do not, in our view, generate a jury question on the failure of consideration defense. The district court should have sustained the trustees' motion for directed verdict on this issue.

II. *Unjust Enrichment.*

■ Iowa Growthland's counterclaim for unjust enrichment is predicated on its payments to the trust after the bank was closed. The doctrine of unjust enrichment is an equitable principle. It mandates that "one shall not be permitted to unjustly enrich himself at the expense of another or to receive property or benefits without making compensation" for them. *Larsen v. Warrington,* 348 N.W.2d 637, 642–43 (Iowa App.1984).

■ Generally the existence of a contract precludes the application of the doctrine of unjust enrichment. *Smith v. Harrison,* 325 N.W.2d 92, 94 (Iowa 1982); 66 Am.Jur.2d *Restitution and Implied Contracts,* § 6 at 949 (1973). Here the district court's instruction to the jury on the counterclaim embodied this principle. For example, the court instructed the jury that Iowa Growthland could recover on its counterclaim provided the jury found, among other things, that failure of consideration excused performance under the agreement. Iowa Growthland did not object to this instruction. And, as we said, the jury found that Iowa Growthland was not entitled to damages.

We have already determined that there was not, as a matter of law, a failure of consideration. In view of our holding on the failure of consideration issue, we think the district court should have sustained the trustees' motion for directed verdict on the unjust enrichment counterclaim.

III. *Agency.*

■ The trustees moved for a directed verdict against Dodgen personally because the record showed he signed the agreement. Dodgen resisted the motion, contending there was enough evidence in the record to generate a jury question on his agency defense. The only evidence on this point was Dodgen's testimony. Dodgen testified that when he signed the agree-

ment St. John agreed that Humboldt Realty—Iowa Growthland's predecessor—would be the responsible party. The district court overruled the motion. The jury then determined that Dodgen was acting as an agent for Humboldt Realty when he signed the agreement. For reasons that follow we think the district court should have sustained the motion for directed verdict.

At the time Dodgen and St. John signed the agreement, Humboldt Realty was not in existence. Ordinarily in these circumstances Dodgen would be personally liable. The law is clear that an agent who purports to act on behalf of a nonexistent principal is liable as a party to the agreement. The rationale for the rule is simply that in such circumstances there is no agency. *James G. Smith & Assoc., Inc. v. Everett,* 1 Ohio App.3d 118, 120, 439 N.E.2d 932, 935 (1981); 3 Am.Jur.2d *Agency* § 306 (1986). As *Everett* points out, this situation frequently happens when a corporate promoter enters into contracts before the corporation is actually incorporated.

There is, however, an exception to this rule. If the other contracting party knows that the principal does not exist and looks to the principal alone for responsibility, the promoter is relieved of personal liability. *Vodopich v. Collier County Developers, Inc.,* 319 So.2d 43, 44–45 (Fla.App.1975); 3 Am.Jur.2d *Agency* § 306 (1986).

Here the pivotal question is whether St. John agreed to look to Humboldt Realty alone for payment. We think reasonable minds would conclude from this record that he did not.

On the one hand, we have Dodgen's testimony that St. John did so agree. This, however, was precisely the kind of evidence prohibited by the district court's pretrial ruling, which was based on the parol evidence rule. In concluding that the parol evidence rule applied, the court said:

> The court has reviewed the agreement at issue and it cannot find the least bit, any evidence, or any ambiguity which would show that Joe W. Dodgen signed the agreement in any other capacity other

than in his individual or as the principal.... In this instance ... there is no ambiguity and the parol evidence rule would preclude the [defendants] from entering any testimony otherwise.

The parol evidence rule excludes extrinsic evidence that is offered solely for the purpose of varying, adding to, or subtracting from a written agreement. *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 433 (Iowa 1984). The rule is one of substantive law. This means that evidence admitted in violation of the rule may not be used as proof to the extent of its rational persuasiveness even though there was no objection to its introduction. *Matter of Estate of Kalouse,* 282 N.W.2d 98, 105 (Iowa 1979). In view of *Kalouse,* we doubt the competency of Dodgen's testimony even though the district court allowed it.

On the other hand, against this evidence of dubious competency, we have substantial evidence that establishes Dodgen was acting in his personal capacity. First, as the district court ruled, the language of the agreement is unequivocal on this point. For example, the opening paragraph states that "This agreement made and entered into by and between B.P. St. John ... and Joe W. Dodgen ... said B.P. St. John being hereafter referred to as the seller and the said Joe W. Dodgen being hereafter referred to as the buyer." Moreover, Dodgen ostensibly signed the agreement in his individual capacity.

Second, St. John and Dodgen were, at the time of the agreement, very knowledgeable in financial and legal matters. It is inconceivable to us that St. John would turn over valuable assets and look solely to a nonexistent corporation for payment. It is also equally inconceivable to us that Dodgen would fail to insist on express language in the agreement that would relieve him of personal liability. Simply put, we think reasonable minds would conclude that the absence of such language meant that St. John was looking to Dodgen for payment, and Dodgen knew it.

Last, in 1982 Dodgen acknowledged his personal liability. In a letter to one of the

trustees—a letter we previously mentioned—Dodgen said:

> You are also correct in that the contract between me and Ben and Adeline St. John is a personal obligation even though it was later assigned to First Investors Services, Inc.

This damaging admission coupled with the other evidence leads us to conclude that the district court should have sustained the motion for directed verdict on the agency issue.

As we noted, the only proof supporting Dodgen's contention was, at most, of dubious competency. This proof, in our view, amounted to no more than a mere scintilla of evidence. Such proof, of course, does not rise to the level of substantial evidence. *See Petersen v. Farmers Casualty Co.,* 226 N.W.2d 226, 232 (Iowa 1975) (court should have withdrawn certain elements of damages from jury because plaintiff's testimony on these elements constituted no more than mere scintilla of proof).

## IV. *Disposition.*

The remaining question is whether the district court should have granted the trustees' motion for judgment notwithstanding the verdict on all three issues. We think it should have. Even though the district court did not, we can under the provisions of Iowa Rule of Appellate Procedure 26. That rule provides that

> [w]hen a judgment is reversed for error ... in overruling a motion for judgment [notwithstanding the verdict] ... and the granting of the motion would have terminated the case in favor of the appellant, the appellate court may enter or direct the trial court to enter final judgment as if such motion had been initially sustained; provided that if it appears from the record that the material facts relating thereto were not fully developed at the trial or if in the opinion of the appellate court the ends of justice will be served thereby, a new trial shall be awarded of such issue or of the whole case.

Here had the district court granted the trustees' motion for judgment notwith-

standing the verdict on all three issues, the case would have terminated in the trustees' favor. Our review of the record convinces us that all the material facts relating to such issues were fully developed at trial. Finally, in our view the ends of justice would not be served by permitting this case to be retried.

Accordingly, we reverse the posttrial ruling of the district court. We remand the case to the district court with directions to enter judgment in favor of the trustees for $160,976.26—the delinquent amount at the time of trial—together with interest and costs. *See* Iowa R.App.P. 26.

REVERSED AND REMANDED WITH DIRECTIONS.