# In the Iowa Supreme Court

No. 22–1721

Submitted March 27, 2025—Filed May 2, 2025

**Bradshaw Renovations, LLC,**

Appellant,

vs.

**Barry Graham** and **Jacklynn Graham,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Sarah Crane, judge.

A construction contractor seeks further review of the court of appeals decision affirming an adverse jury verdict on consumer fraud claims and the district court's judgment on its unjust enrichment and quantum meruit claims.

**Decision of Court of Appeals Vacated; District Court Judgment Affirmed in Part, Reversed in Part, and Case Remanded.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Matthew J. Hemphill (argued) of Bergkamp, Hemphill & McClure, P.C., Adel, for appellant.

Zachary J. Hermsen (argued) and Anna E. Mallen of Whitfield & Eddy, P.L.C., Des Moines, for appellees.

**Christensen, Chief Justice.**

"Where's the beef?"[1] While a contract dispute between homeowners and their hired contractor led a jury to find that the contractor committed consumer fraud, we are left questioning the substance of this verdict on appeal. Upon our review of the record, we can only include that there was, in fact, no beef. The homeowners' evidence of consumer fraud did not meet the statutory definition of a "prohibited practice" under Iowa Code section 714H.3(1) (2020). The contractor may be guilty of sloppy billing practices, but the evidence presented at trial fails to demonstrate that he improperly billed the homeowners with the intent that they would rely on it to do business with him. Consequently, we reverse the district court ruling on this issue and remand for the entry of judgment consistent with this opinion.

### I. Background Facts and Proceedings.

Barry and Jacklynn Graham began conversations with Bradshaw Renovations, LLC (Bradshaw) about renovating their Urbandale home in the summer of 2019. They spent the summer emailing back and forth about the budget and plans, and Bradshaw provided the Grahams with a five-page itemization of labor and materials that was described as "the current estimate" of the project totaling $136,168.16. This estimate contained a description of each stage of the construction with a corresponding lump sum total charge for that

---

[1]Marc Berman, *'Where's the Beef'? The Iconic Clara Peller Spot for Wendy's Turns 40*, Forbes (Jan. 10, 2024, 10:31 AM), https://www.forbes.com/sites/marcberman1/2024/01/10/wheres-the-beef-the-iconic-clara-peller-spot-for-wendys-turns-40/ [https://perma.cc/R8E4-EWHP] ("Flashback to January 9, 1984. Clara Peller, the diminutive 81 year-old angrily asked, 'Where's the beef?' in her first television appearance as a spokesperson for Wendy's. Peller, as you might recall, was featured with two other ladies in that 1984 spot while being served a huge hamburger bun containing a miniscule hamburger patty. Those three words became a cultural phenomenon. . . . [It] even had a political connection, making it into the 1984 campaign for the then Democratic Presidential nomination when Walter F. Mondale used it to suggest a lack of substance in proposals advanced by his chief rival, Gary Hart." (emphasis omitted))

stage. It did not establish a specific labor rate or represent that Bradshaw was excluding a profit margin on the labor and materials.

Bradshaw incorporated this five-page itemization into the written contract, which the parties entered into on August 1. The first page of the contract states that Bradshaw "will revise the estimate as we go to keep us up to date as things change for allowance and scope of work through out the project," and describes the estimate as "an offer to you from Bradshaw Renovations, LLC, for the services and cost detailed herein." Moreover, the contract provides that the Grahams' "signature below constitutes acceptance of the offer and a binding contract" and sets a payment schedule. Under this schedule, the Grahams would pay $1,000 "upon acceptance," 33% of the estimate "upon foundation work completion," another 33% "upon completion of drywall," and the balance upon the renovation's completion. Additionally, the contract required Bradshaw to email any changes to the scope of services to the Grahams, who must "immediately inform Bradshaw Renovations, LLC in writing and via email if the changes detailed are inaccurate. Failure by customer to respond in writing and via email within three (3) days from receipt of any said email constitutes acceptance by customer of the proposed changes."

Bradshaw began work on the Grahams' home shortly thereafter. On September 3, Bradshaw emailed the Grahams a revised estimate that increased the cost by $3,000 for a new total of $139,168.16 for additional required concrete work. The Grahams emailed their approval of the change the same day. This was the only revised estimate that Bradshaw sent the Grahams during the project, but it periodically sent them invoices for the work performed that detailed specific labor and material expenses—some of which varied from the estimate— and discussed changes in person. For example, the invoice that Bradshaw emailed Jacklynn on November 6 noted, "The foundation company needed to add

some supports and a little more wall than expected so there was an up-charge on those items." The Grahams promptly made payments on the invoices but gradually became concerned about Bradshaw's communications and billing practices.

In a November 16 email to Bradshaw, the Grahams sought to ensure that the parties were "communicating with one another each step of the way to avoid any potential issues from forming" because "[a] lot has changed in terms of weather, what people did incorrectly, and what you've decided to change because of the weather." They asked "to see this in written form so that we can approve of things, as per the terms of our written agreement." Bradshaw declined the Grahams' request to see these changes in writing three days later, claiming it was only concerned with one line item for which there was an allowance. Bradshaw indicated that it would address this item after it knew what the expense incurred was. It also maintained that it had not changed the Grahams' budget "since we have not made any cost changing decisions to this point."

Bradshaw sent additional invoices in January and February 2020, which the Grahams paid in full. The payment of these invoices brought the Grahams' total payment on the project to $112,098.79. In March 2020, Bradshaw sent the Grahams a fifth invoice, writing, "we are almost done" in the cover email. This invoice brought the total billed on the project to $139,472.88—about $300 over Bradshaw's last estimate. The Grahams paid the "nice even number" of $28,000, bringing their total paid to $140,098.79.

In May, Bradshaw emailed the Grahams a "[f]inal bill" of $18,779.15, bringing the total billed to the Grahams for the project to $158,252.03. The Grahams quickly responded with concerns that the invoice was "exceptionally higher than what we talked about." They sent another email later that day expressing that they had begun reviewing line items and were troubled that

Bradshaw had billed almost $20,000 more than its last estimate even though the Grahams purchased their own flooring. Further, they wanted "to understand and see how this is possible as we didn't do anything in excess with regards to our estimates." Through a series of emails, the Grahams sought and obtained around 150 pages of documentation from Bradshaw about the billing on their project.

On May 26, Bradshaw sent a follow-up email to the Grahams, asking if they "need to sit down and go over items and clear up any confusion." The Grahams notified Bradshaw that they had contacted an attorney to review the contract and told Bradshaw to let them know "[i]f there are invoices you are willing to reduce or waive." They indicated needing "a couple weeks to get back to [Bradshaw]." Upon learning this, Bradshaw informed the Grahams that it could no longer communicate with them directly and would plan to hear from their attorney.

On October 19, Bradshaw filed a petition seeking payment from the Grahams for the final invoice under claims of breach of contract, unjust enrichment, and quantum meruit. The Grahams counterclaimed breach of contract and consumer fraud.[2] A four-day jury trial occurred in August 2022 in which the parties tried the breach of contract and consumer fraud claims to the jury. Bradshaw's unjust enrichment and quantum meruit claims were left for decision by the court after the jury's verdict and based on the evidence submitted at trial.

The Grahams sought $24,000 in damages to remedy "improper work" that Bradshaw performed under the contract and $22,468.91 in actual damages for

---

[2]They also challenged a mechanic's lien under Iowa Code section 572.32(2) that Bradshaw had filed over their payment dispute, but that is not at issue on appeal.

their consumer fraud claim. They argued that Bradshaw overbilled them by about $40,000 and subtracted the amount that they had not paid on the final invoice to reach that $22,468.91 request. At trial, the Grahams focused in part on their claims that Bradshaw misrepresented or omitted material facts and deceived them into paying more than the actual time and materials properly due under the contract. In addition to the damages for improper work and consumer fraud, the Grahams sought treble statutory damages, arguing that Bradshaw's conduct and lack of remorse demonstrated "willful and wanton disregard for the rights of the Grahams."

In contrast, Bradshaw asserted that the contract was for a fixed fee instead of a time-and-materials contract. Bradshaw's owner testified that he notified the Grahams of the changes to the contract's scope of services through the invoices and had many verbal conversations on-site about the work with the Grahams. According to Bradshaw, the Grahams accepted these changes when they paid the invoices without disputing the changes in writing within three days. Thus, their failure to pay the final invoice breached the contract. Bradshaw asked for $18,779.15 in damages for the unpaid amount.

Bradshaw acknowledged that some of the work on the Grahams' house needed to be remedied but questioned what needed to be fixed "and at what cost." It maintained that any damages on the Grahams' breach of contract claim should be reduced by 20% because the Grahams failed to mitigate any defects sooner when costs were lower. Moreover, it argued that the Grahams failed to demonstrate any consumer fraud, as Bradshaw did not commit any prohibited practice and the Grahams did not suffer any ascertainable loss within the meaning of Iowa's consumer fraud statute. Additionally, Bradshaw claimed that the many emails between Bradshaw and the Grahams in which Bradshaw

answered their billing questions are proof that it had no intent to defraud the Grahams.

At the close of evidence, Bradshaw moved for directed verdict on the consumer fraud claim. It argued that the Grahams failed to present substantial evidence that (1) they suffered actual damages, (2) Bradshaw engaged in any prohibited practice under the statute, or (3) Bradshaw's conduct was willful and wanton to support statutory damages for consumer fraud. The district court denied the motion. The jury returned a verdict in favor of the Grahams and found that Bradshaw failed to prove its breach of contract claim. It awarded the Grahams $16,000 in damages for their breach of contract claim and $40,000 in damages for their consumer fraud claim—$10,000 in actual damages and $30,000 in statutory damages.

Bradshaw subsequently moved for judgment notwithstanding the verdict and a new trial on the consumer fraud claim, which the district court denied in a written order. The district court also used this order to award the Grahams attorney fees for their attorneys' work on the consumer fraud claim and to deny Bradshaw's claims of unjust enrichment and quantum meruit. Both parties appealed on different issues, and we transferred the case to the court of appeals.

The court of appeals affirmed the jury verdict, along with the district court's denial of Bradshaw's posttrial motions and its dismissal of Bradshaw's unjust enrichment and quantum meruit claims. Additionally, it affirmed the district court's attorney fee award to the Grahams but remanded the case to the district court to determine the Grahams' compensation for appellate attorney fees. We granted Bradshaw's application for further review.

**II. Analysis.**

Bradshaw challenges the district court's denial of its motions for directed verdict, judgment notwithstanding the verdict, and new trial, along with its

dismissal of Bradshaw's claims for unjust enrichment and quantum meruit. It asks us to "reverse the judgment against it on [the Grahams'] consumer fraud claim as well as the district court's adverse judgment on Bradshaw's equitable claims." Notably, Bradshaw does not appeal the jury's verdict in favor of the Grahams on their breach of contract claim, so the jury's award of $16,000 in damages on this claim still stands.[3] We address Bradshaw's claims in turn as necessary.

**A. The Grahams' Consumer Fraud Act Claims.** Bradshaw attacks the district court's denial of its motions for directed verdict and judgment notwithstanding the verdict on its consumer fraud claim. We do not fault the district court for denying Bradshaw's motion for directed verdict and submitting the case to the jury to avoid another trial in case of error. *See State v. Keding,* 553 N.W.2d 305, 308 (1996); *see also In re Est. of Johnston,* 16 N.W.3d 700, 706 (Iowa 2025). This leaves room for the district court to grant a judgment notwithstanding the verdict "[a]fter the jury returns a verdict . . . as long as it is based on the same grounds as the original motion at the close of evidence and the movant is entitled to judgment as a matter of law." *Keding,* 553 N.W.2d at 308.

The district court should grant a motion for judgment notwithstanding the verdict if there is not substantial evidence to support the nonmoving party's claim. *Carter v. Carter,* 957 N.W.2d 623, 635 (Iowa 2021). Substantial evidence exists "when a reasonable mind would accept it as adequate to reach a

---

[3]The Grahams cross-appeal, arguing that the district court erred in denying their request for certain attorney fees concerning their consumer fraud claim. However, we need not address this claim because the Grahams are no longer entitled to those attorney fees given our decision to reverse the consumer fraud verdict. Similarly, we need not address Bradshaw's challenge to the district court's denial of its motion for new trial given our holding on the motion for judgment notwithstanding the verdict.

conclusion." *Id.* (quoting *Johnson v. Dodgen*, 451 N.W.2d 168, 171 (Iowa 1990)). And because the district court must view the evidence in the light most favorable to the nonmoving party, we, too, view the evidence in that light. *Id.* Even so, the district court erred in denying Bradshaw's motion for judgment notwithstanding the verdict because there was not substantial evidence that Bradshaw engaged in a prohibited practice under Iowa's consumer fraud statute.[4]

Chapter 714H of the Iowa Code establishes and details the scope of Iowa's Private Right of Action for Consumer Frauds Act. Under the Act, "[a] consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages." Iowa Code § 714H.5(1). Iowa Code section 714H.3(1) governs prohibited practices or acts, stating that "[a] person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon" these practices or actions "in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes."

Here, the Grahams argued at trial that Bradshaw engaged in deceptive billing practices that resulted in actual damage to the Grahams. Specifically, the Grahams asserted: "(1) Bradshaw represented its hourly labor rate was $45, but billed labor at a higher rate; (2) Bradshaw represented that it would make no

---

[4]Bradshaw presents three different arguments regarding the district court's denial of this motion, including that the Grahams failed to show an ascertainable loss from Bradshaw's alleged consumer fraud and that there is insufficient evidence of a "willful and wanton" disregard to support the award of treble statutory damages. We need only address the claim challenging the Grahams' evidence that Bradshaw engaged in a prohibited practice under Iowa's consumer fraud statute.

upcharges on labor and materials yet added a profit; and (3) various items that appeared on receipts were improperly billed to Graham." Bradshaw maintains there was not substantial evidence to support these claims, and our review of the record confirms this.

First, the 2019 contract did not include a labor rate or an estimate of labor hours necessary to complete the project. The parties never agreed that Bradshaw would charge $45 an hour for labor. Instead, this $45 an hour labor rate arose in emails between the parties after the project was finished in May 2020, in which Bradshaw was attempting to break down the costs after the Grahams disputed their final invoice. Jacklynn acknowledged this at trial, testifying that she knew nothing about the labor amounts until May 2020 and that nothing in the 2019 contract stated that Bradshaw was charging $45 an hour for labor.

Likewise, Bradshaw never represented to the Grahams that it would not include a profit margin in its cost to induce them into doing business with it. Just as neither the contract nor the invoices clarified a specific labor rate, none of them implied that there would be no markup on subcontractors or material suppliers. Again, Jacklynn recognized this at trial.

Ultimately, the evidence that the Grahams presented on this issue only shows that Bradshaw's post hoc justification for requesting more than the costs specified in the contract was suspect. But this does not amount to a prohibited practice under the consumer fraud statute because Bradshaw never misrepresented its labor rate to the Grahams with the intent that they would rely on this misrepresentation to enter the contract in 2019. Perhaps it is unsurprising, then, that the Grahams' brief omits the reliance portion of the statute in contesting Bradshaw's argument on this issue.

Finally, there was not substantial evidence that Bradshaw engaged in a prohibited practice by improperly billing the Grahams for materials not used on

their project. This improper billing argument, too, is based on receipts that Bradshaw provided the Grahams when their dispute over the final invoice began. And these receipts were not limited to items bought only for the Grahams' project, as the undisputed testimony at trial was that Bradshaw had multiple projects going at once and would purchase materials for these projects together. On cross-examination of Jacklynn, Bradshaw's counsel went item-by-item with her to confirm that the Grahams were not invoiced for any of these additional items that were not used on the Grahams' project.

In summary, the Grahams failed to demonstrate that Bradshaw committed consumer fraud by improperly billing them for materials that it did not use on their project. Further, any alleged misrepresentation of the rate for labor or materials revealed after the work was performed is not a "prohibited practice" that caused an ascertainable loss under the consumer fraud statute. *See id.* Therefore, the district court should have granted Bradshaw's motion for judgment notwithstanding the verdict. This resolution requires reversal of the judgment for treble damages and attorney fees under the Act.

**B. Bradshaw's Equitable Claims of Unjust Enrichment and Quantum Meruit.** According to Bradshaw, the district court erred in concluding that Bradshaw's claims for unjust enrichment and quantum meruit were for services covered under the parties' written contract, and thus, it wrongly denied Bradshaw equitable relief on these claims. We review these claims de novo because they were tried in equity. *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 684 (Iowa 2020). "Nevertheless, we give weight to the factual findings of the district court, especially with respect to determinations of witness credibility." *Carroll Airport Comm'n v. Danner*, 927 N.W.2d 635, 642–43 (Iowa 2019) (quoting *City of Eagle Grove v. Cahalan Invs., LLC*, 904 N.W.2d 552, 558 (Iowa 2017)).

Unjust enrichment occurs when one party is enriched at the expense of the other under unjust circumstances. *MidWestOne Bank v. Heartland Co-op*, 941 N.W.2d 876, 885–86 (Iowa 2020). Similarly, quantum meruit "denote[s] a particular subclass of implied-in-fact contracts—an implied-in-fact contract to pay for services rendered." *Iowa Waste Sys., Inc. v. Buchanan County*, 617 N.W.2d 23, 29 (Iowa Ct. App. 2000). Both doctrines are based on the concept of an implied contract. *Kunde v. Est. of Bowman*, 920 N.W.2d 803, 807 (Iowa 2018). While an implied contract may coexist with a written contract, it is only to the extent that a party is seeking recovery for matters not addressed in the contract because express and implied contracts cannot coexist on the same subject matter. *Id.* An express contract supersedes an implied contract, and Bradshaw cannot recover on its theories of unjust enrichment and quantum meruit if its implied contract theories relate to the same subject matter as the written contract. *Id.* That is the case here.

Contrary to Bradshaw's argument that the scope of the renovation expanded beyond the parties' written contract, the written contract has an express provision detailing how the parties would handle changes to the scope of services. It states,

> Any changes to the scope of services detailed herein that the parties agree to make following customer's acceptance of this estimate shall be in writing and fully detailed via an email from Bradshaw Renovations, LLC to customer at the email address provided by customer below. Upon receipt, customer shall immediately inform Bradshaw Renovations, LLC in writing and via email if the changes detailed are inaccurate. Failure by customer to respond in writing and via email within three (3) days from receipt of any said email constitutes acceptance by customer of the proposed changes detailed by Bradshaw Renovations, LLC.

Further, it provides, "I will revise the estimate as we go to keep us up to date as things change for allowance and scope of work through out the project."

Bradshaw reiterated these contractual obligations during the project, emailing the Grahams to acknowledge that some changes had occurred, but they did not result in "cost changing decisions." It also confirmed in that same email that it would send a revised estimate if there were cost-changing decisions. These contractual provisions distinguish this case from *Nepstad Custom Homes Co. v. Krull*, 527 N.W.2d 402 (Iowa Ct. App. 1994), which Bradshaw argues applies here. They also prevent Bradshaw from circumventing its written agreement with the Grahams to recover under theories of unjust enrichment and quantum meruit after it failed to follow the express written contract. We affirm the district court's dismissal of these claims.

### III. Conclusion.

For these reasons, we affirm the district court ruling in favor of the Grahams on the breach of contract issue, including the $16,000 jury award, and the district court's dismissal of Bradshaw's claims for equitable relief. Nevertheless, we reverse the ruling and corresponding awards for damages and attorney fees on the consumer fraud claims. We remand to the district court for the entry of judgment in accordance with this decision.

**Decision of Court of Appeals Vacated; District Court Judgment Affirmed in Part, Reversed in Part, and Case Remanded.**