Chase Investment Company, appellee, v. Harold Kramer et ux., appellants.

No. 48059.

(Reported in 55 N.W. 2d 467)

1370

NOVEMBER 11, 1952.

J. F. Wirds, of Iowa Falls, and Lundy, Butler & Lundy, of Eldora, for appellants.

Uhlenhopp & Uhlenhopp, of Hampton, for appellee.

SMITH, J.—The $20,000 note, dated September 16, 1949, signed by Harold and Alice Kramer and by Kramer Motor Company, Inc., was secured by the mortgage in suit on the Kramer homestead, subject to first mortgage of $4000. There was also a securing mortgage on certain of the·motor company property, subject to prior mortgages, but it is not involved here. The motor company is not a party defendant.

The Kramer mortgaged homestead is near Hampton, Iowa. They were the principal·owners, and the president and secretary respectively of the Kramer Motor Company operating an automobile and implement business.

Plaintiff is a Des Moines corporation engaged in automobile financing. Its president was Hal S. Chase II. He and defendant Harold Kramer and their respective corporations had transacted business together over a period of years. Plaintiff financed the Kramer Motor Company, loaning it money on chattel mortgage security and buying from it conditional sales contracts endorsed over with recourse.

In the late summer of 1949 defendant Harold Kramer and Hal S. Chase formed a partnership known as Kramer Storage Company or Kramer Grain Storage Company, to engage in the business of storing shelled corn under a two-year, million-bushel contract with the U. S. Commodity Credit Corporation.

At the time the note and mortgage in suit were executed the partnership was building a large storage plant near Hampton, estimated to cost $160,000. (Incidentally the final cost was

$283,000.) According to Kramer's testimony the R.F.C. was at first expected to finance the entire cost but the loan amount was later scaled down to $85,000. Chase was to contribute $70,000 (other testimony said $75,000) and Kramer $20,000 to the capital of the partnership.

Defendants claim the note and mortgage in suit represented a loan to be made defendants by plaintiff "to be used by the defendants in the building of the grain storage bin" and that the consideration failed because the money was never advanced by plaintiff.

The trial court pertinently points out that while the steel was not fully paid for on September 16 when the note and mortgage were given, the unpaid portion was the obligation of the partnership and not of the defendants personally or the motor company, makers of the note. And further that defendant Kramer had already furnished and paid in his agreed $20,000 contribution to the partnership a few days earlier and "it would seem [if defendants' theory were correct] that the note would have been that of Kramer Storage Co., a partnership consisting of Chase and Kramer."

Plaintiff's version of the transaction, on the other hand, links it with the financing dealing between plaintiff and the Kramer Motor Company. Plaintiff claims it demanded additional security for its loans to the motor company because it had discovered that company had disposed of property covered by mortgage and conditional sale contract held by plaintiff, without accounting to plaintiff and without applying the proceeds of the indebtedness covering the property.

The trial court found the motor company's indebtedness to plaintiff on that day (September 16) totaled $50,000 to $60,000 and that there was ample consideration for the note and mortgage in suit as the Kramer Motor Company went into receivership December 5, 1949, and at that time "after allowing all credits from all sources there was due from Kramer Motor Co. to the plaintiff on account of its unliquidated primary and secondary obligations to the plaintiff the principal sum. of $21,615.14."

We shall not go into the intricacies of accounting, the many

negotiations with bankers and others including the R.F.C. and the details accompanying the crumbling of the Kramer financial structure. To do so would serve no useful purpose. We have to determine a plain question of fact, the purpose of the note and mortgage involved here.

I. The burden was upon defendants to prove the pleaded lack or failure of consideration. Our statutes make that too plain to require further citation of authorities. See sections 537.2, 537.3, 541.24 and 541.28, Iowa Code (I.C.A.) 1950. The written contract imports a consideration. Want or failure of consideration is a matter of defense.

Defendants on appeal cite three or four authorities to support the proposition that "parol evidence is admissible to prove want or failure of consideration" even when the action is based on a written contract reciting and importing consideration. The point is not contested and we deem it sound. But it cannot avail defendants here.

Plaintiff argues that defendants' burden is to prove lack of consideration "by clear and convincing evidence." That may be the rule in equity though we seem never to have so held except in the early case of Hall v. Perry, 3 (G. Greene) Iowa 579, where it is said the proof must be "strong and positive." See 59 C. J. S., Mortgages, section 98, page 143. But we need not invoke that principle in support of the trial court's decision here. While the direct testimony as to what took place is in conflict, we think defendants have failed to carry the burden of a mere preponderance.

II. The testimony of Chase directly contradicts Harold Kramer's. Defendants enumerate three things claimed to support their version: 1. The undoubted need of the storage company for money to pay bills of lading for steel already arrived and arriving. 2. The contention that the so-called "shortages" of the motor company (due to sale of mortgaged property without accounting to plaintiff for the proceeds) were not then known to plaintiff. 3. The argument that these "shortages" were not large enough in amount to require $20,000 additional security. We discuss these in their order.

1. The carloads of steel for the storage plant began arriving

—two on September 11 and three more September 13, 1949. There was then undoubted need for immediate cash. But on September 12 Chase deposited $45,000 to the credit of the storage company—$20,000 borrowed by him that day from the First National Bank of Hampton, plus $25,000 he brought with him from Des Moines. This $45,000 with $30,000 previously paid in by him made the total agreed $75,000 he was to invest in the storage company partnership.

Furthermore, on September 14 the partnership storage company was credited with $15,000, proceeds of a second mortgage (dated September 12, 1949) placed by Kramer on the garage of the Kramer Motor Company. Kramer had already paid out $5,000 for the partnership and this $15,000 made up his agreed $20,000 contribution to the partnership.

Mr. Bramwell, president of the bank, and Mr. Keepf, cashier, both say the September 14 deposit was the result of a loan the bank made Kramer on the 12th, the same day Chase deposited the $45,000.

The bank books show that on or about September 14, a $58,000 check was drawn on the partnership (Kramer Storage Company) account to pay for the steel so the railroad company could release it. The bank record shows that check cleared the 15th. This was still a day before the note and mortgage in suit were executed.

Kramer testifies a down payment of $15,000 had previously been made when the steel purchase was arranged. That payment came out of the $30,000 previously advanced by Chase as a part of his $75,000 investment in the partnership. It was apparently paid by check of the motor company which was later reimbursed out of the storage company partnership account.

It seems fair to deduce from the evidence that while the partnership had been embarrassed for money to release the steel, the immediate crisis was past before September 16 when this note and mortgage were given. How remaining payment for steel and other cost of the building was made is not shown.

2. The weight of evidence is against defendants' claim that plaintiff did not know of the Kramer Motor Company's so-called "shortages" on September 16. Plaintiff's collection manager testi-

fies as to the practice of companies of plaintiff's type to make regular checks or audits of their customers "to see whether the merchandise is there and whether the serial number checks with that on our paper."

He says these checks on the Kramer Motor Company had already revealed that numerous pieces of equipment covered by paper held by plaintiff could not be found. He himself went up five or six times and finally he and Chase went to Hampton on September 16 and demanded payment from Kramer for property the Kramer Company had sold without accounting to plaintiff out of the proceeds.

Harold Kramer denies there was any claim of these "shortages" at that time but Mr. Bramwell, president of the bank in Hampton where the papers were signed, testifies he was present and that "the talk there at the bank was that this note and mortgage were given to secure the Hal Chase or the Chase Investment Company, because he was getting nervous about Harold Kramer's paper that the Chase Investment Co. was buying."

It is true there is a conflict as to what was said at the September 16 meeting when the note and mortgage were executed but the circumstances seem to make the testimony of plaintiff's witnesses more reliable than that of defendants'. Not least is the fact, already mentioned, that the note is signed by the *Kramers and their Motor Company,* which circumstance strongly discredits the theory that a loan to the partnership was intended or that it represented an amount to be advanced for the benefit of the partnership. Both Kramer and Chase had already made their respective agreed contributions to the storage company partnership. The obligation for steel was that of the partnership and of both Kramer and Chase as partners. Clearly the note and mortgage in suit could not have been for partnership purposes.

3. Defendants' argument that no such sums were due from the motor company to plaintiff on "shortages" as to justify a demand on September 16 for $20,000 additional security is argumentative only and quite beside the point. It seems to concede *something* was due. Plaintiff need not establish there was on that date a $20,000 "shortage." It is sufficient if the additional

security was given to induce plaintiff to forego action on existing "shortages" and to cover possible future "shortages."

As pointed out by the trial court the Kramer Motor Company was at that time indebted to plaintiff some $50,000 to $60,000. The two corporations were continuing their dealing together. If, as we think the evidence tends to show, the motor company was already running into financial difficulty and had already shown some signs of desperation, the demand for additional security in exchange for refraining from action was natural. And if such security being given was later required (as the undisputed record shows) to make good the motor company's obligations to plaintiff, the consideration was ample. Extension of time and forbearance to sue constitute consideration. 59 C. J. S., Mortgages, section 92; Panama Savings Bank v. Arkfeld, 228 Iowa 313, 318, 291 N.W. 182.

Chase testifies it was only when he threatened to replevin machines Kramer had sold from under plaintiff's paper that Kramer consented to give the additional security so as to have time to collect outstanding accounts and liquidate some of his used machinery to make good the company's shortages. The collection manager testifies the purpose of the trip was "to see if we couldn't get the equipment or get the money for it." Objection was urged only after the evidence was in.

Defendant Kramer testifies: "No, I wasn't behind at all. I might have been behind a month or a month and a half. Might have been behind a month or so, but we would catch up. We wasn't late until October or November." The denial is not too convincing in view of the fact that shortages did occur at some time prior to December 5.

It is undisputed that when the motor company went into receivership there was a shortage due plaintiff of over $21,000. We think it fairly appears the note and mortgage were given to protect against such a contingency and that there was no lack or failure of consideration, whatever amount may have been due when they were given.

III. We have said the sole question here is one of fact. The briefs are almost silent as to legal argument because no serious legal problem is involved. Some testimony relied on most

strongly by defendants does not bear up under analysis. There were two conferences in the bank at Hampton, which fact we think has caused confusion in the minds of some witnesses. One was of course on September 16 at which Mr. Bramwell, president of the bank, says only "Harold (Kramer) and Hal (Chase) and myself and Ralph Stuart were present." Stuart was an attorney called in by Bramwell. It is on this occasion, Bramwell and Chase say, the $20,000 note and mortgage in suit were executed.

Defendant and witness Rummel, president of banks at Williams and Iowa Falls, say the latter was also present and that the purpose of the meeting was to raise money for the storage company partnership to pay for the steel, some of which had already arrived.

But there was undoubtedly the prior conference on or about September 12 at which the steel crisis was certainly discussed and at which time Kramer was trying to raise $20,000 to help meet it and at the same time make his own agreed contribution to the partnership. Rummel admits he was in Hampton that day. Kramer was allowed a loan of only $15,000 that day because the bank already held his note for $5,000, and $20,000 was the limit. We have already referred to this $15,000 which enabled Kramer to complete his contribution to the partnership and the proceeds of which were placed to the partnership account. Rummel's testimony, though his memory was refreshed by reference to a sort of diary, shows some confusion and uncertainty.

On the whole record we are content with the result reached by the trial court. The defendants have not overcome the prima facie case for consideration imported by the written note and mortgage. The decision of the trial court is affirmed.—Affirmed.

All JUSTICES concur.