The **FEDERAL LAND BANK OF OMAHA, A Corporation,** Appellant,

v.

Donald J. **WOODS** and Lola Jean **Woods,** Appellees.

No. 90–747.

Supreme Court of Iowa.

Jan. 22, 1992.

Dale L. Putnam of Putnam and Strand Law Office, Decorah, for appellant.

Larry F. Woods, Oelwein, for appellees.

Considered by HARRIS, P.J., and CARTER, LAVORATO, NEUMAN, and SNELL, JJ.

LAVORATO, Justice.

This is the sixth appeal in a continuing saga arising from successive sales of a 285–acre farm with clouded title. It is a textbook example of the hair splitting inherent in protracted litigation: asserting all issues related to the same claim in separate lawsuits. *See Moser v. Thorp Sales Corp.*, 256 N.W.2d 900 (Iowa 1977) (*Moser I*); *Moser v. Thorp Sales Corp.*, 312 N.W.2d 881 (Iowa 1981) (*Moser II*); *Moser v. Thorp Sales Corp.*, 334 N.W.2d 715 (Iowa 1983) (*Moser III*); *Neylan v. Moser*, 400 N.W.2d 538 (Iowa 1987) (*Moser IV*); *Woods v. Schmitt*, 439 N.W.2d 855 (Iowa 1989) (*Moser V*). At issue are several district court rulings in an action on a promissory note secured by a purchase-money mortgage. The note and mortgage were executed and delivered to the plaintiff-bank by the defendants who used the borrowed funds to purchase the farm.

I. *Background Facts.*

To understand the present controversy, we think it would be instructive to set out some background facts preceding the transaction that generated this latest lawsuit.

In October 1971 Richard and Marguerite Schmitt were in possession of a Clayton county farm under a real estate contract. The district court had decreed a foreclosure of the contract, and the Schmitts' right of redemption against the contract vendors was about to end.

The Schmitts refinanced the farm with Thorp Finance Corporation of Wisconsin. As a condition for the refinancing, Thorp had the authority to auction the farm and all of the Schmitts' livestock, crops, and machinery. To secure the refinancing (a loan evidenced by a note due January 15, 1972), the Schmitts executed and delivered to Thorp a real estate mortgage encumbering the farm.

On December 1 the auction was held and the farm was sold to Clifton G. Moser and Carlys C. Moser for $42,180. The Schmitts and Mosers then entered into an agreement entitled an "offer to buy" incorporating the sale terms and provisions for payment of taxes and commissions. The Mosers paid the down payment of $8430 called for by the agreement.

Closing was set for January 15, 1972. But the Schmitts refused to close and continued to farm the property.

Thorp then foreclosed its mortgage against the Schmitts in July 1973. In late August the Mosers sued the Schmitts for specific performance of the December 1, 1971, offer to buy. Later the Mosers joined Thorp as a defendant and amended their petition to include a count to quiet title. In October the district court enjoined the mortgaging, encumbering, or selling of the farm. But the court refused to enjoin the sheriff's foreclosure sale pursuant to the Thorp foreclosure decree.

In December 1973, the sheriff's sale was held and the sheriff's certificate of sale was issued to Thorp, the highest bidder.

In October 1974 the Schmitts conveyed their redemption rights to a trustee. On December 12, 1974—just one day before the Schmitts' redemption rights were to expire—the trustee accepted an offer to buy the farm from Donald J. and Lola Jean Woods.

That brings us to the transaction in question. The Federal Land Bank of Omaha (FLB) loaned the Woods funds to cover a portion of the purchase price. The Woods had paid $9000 down with the offer on December 12, 1974, and paid an additional $41,000 on February 3, 1975.

FLB and the Woods had separate attorneys. Both attorneys examined the abstract and both noted in their title opinions the specific performance and quiet title actions brought by the Mosers. In addition, a real estate agent who had shown the farm to the Woods on December 8, 1974, told them that the Mosers were claiming ownership of the farm.

In *Moser I*, this court determined that the Mosers had a valid and enforceable contract to buy the farm. *Moser I*, 256

N.W.2d at 907. This court remanded the case. The remand allowed the Mosers to amend their petition so they could add the Woods as defendants in their quiet title action. *Id.* at 912.

In *Moser II,* this court found that the Woods were not good faith purchasers of the property because they had notice of the Mosers' claim. *Moser II,* 312 N.W.2d at 886–90. The Woods' interest in the farm therefore rose no higher than the Schmitts' interest: the right to be paid the purchase price from the Mosers. *Id.* at 898. As a result of *Moser II,* title was quieted in the Mosers. The Woods were also ousted from possession and held liable for damages.

In the current brouhaha, FLB seeks reimbursement for funds it lent the Woods to purchase the farm. In this regard the Woods signed two documents in favor of FLB: (1) a promissory note for $76,500, and (2) a purchase-money mortgage. The Woods signed the note and mortgage on February 26, 1975. In late March FLB conveyed the funds and the Woods delivered FLB the note and mortgage.

The Woods put $28,026 of the loan amount into a future payment account. They put the remainder toward the purchase price of the ·farm and loan costs.

When it became clear that the Woods did not have marketable title to the farm, the Woods discontinued paying on the note. FLB then started this action to collect on the note.

## II. *Background Proceedings.*

FLB filed its petition in July 1982. The Woods answered and asserted several affirmative defenses. The one pertinent here was failure of consideration. The Woods originally alleged a complete failure of consideration. They later amended to allege a partial failure of consideration.

The Woods also counterclaimed. They alleged negligence and breach of contract because of FLB's alleged failure to make sure that the mortgage was a first lien on the farm.

FLB's motions for summary judgment on these issues were overruled.

The Woods filed a jury demand. Later they withdrew it. This withdrawal allowed the district court to determine the validity of FLB's claim for the note balance. The counterclaims and all but one of the affirmative defenses were left for the jury.

The jury ruled in favor of FLB on the counterclaims. It also found in favor of FLB on all of the affirmative defenses except one: partial failure of consideration. The jury found in favor of the Woods on that affirmative defense. The district court found against the Woods on the one affirmative defense tried to the court: unjustifiable impairment of collateral.

After posttrial motions were filed and additional hearings, the court found for FLB on the note for $128,469.57. However, the court offset this figure by the amount the jury found represented the partial failure of consideration. The court calculated the loss to the Woods as the difference between the farmland value they should have received ($90,000 purchase price) and the value of their interest ($32,-969.13) as determined in *Moser III. See Moser III,* 334 N.W.2d at 719–20. This amounted to a set-off of $57,030.87. The district court set off this amount plus interest against the $128,469.57 judgment in favor of FLB, reducing the judgment to $68,571.54.

The district court denied the remaining posttrial motions of the parties, as well as their requests for attorney fees. FLB appealed; the Woods cross-appealed.

The appeal and cross-appeal raise a number of issues. But the result we reach on the appeal requires us to address only four.

## III. *FLB's Motions for Directed Verdict and Judgment Notwithstanding the Verdict as to the Woods' Affirmative Defense of Partial Failure of Consideration.*

FLB moved for directed verdict on the partial failure of consideration defense. It urged there was not sufficient evidence to submit this defense. The district court denied the motion. Following trial, FLB moved for judgment notwithstanding the

verdict on the same ground. The district court also denied this motion. FLB thinks these rulings were erroneous. We agree.

Iowa Rule of Civil Procedure 243 pertinently provides:

> Any party may, on motion, have judgment in his favor despite an adverse verdict ...:
>
> ....
>
> b. If the movant was entitled to have a verdict directed for him at the close of all the evidence, and moved therefor, and the jury did not return such verdict, the court may then either grant a new trial or enter judgment as though it had directed a verdict for the movant.

If the district court thinks it was wrong in denying a motion for directed verdict, the court has two options under this rule. It may order a new trial. Or it may enter judgment as though it had directed a verdict.

■ On appeal, we have similar options. We can remand for a new trial. Or we can order the district court to enter judgment as though it had directed a verdict for the movant. *In re Estate of Klein*, 241 Iowa 1103, 1119, 42 N.W.2d 593, 602 (1950).

■ A motion for judgment notwithstanding the verdict must stand or fall on the grounds stated in the motion for directed verdict. And, on appeal, our review is limited to those grounds. *Johnson v. Dodgen*, 451 N.W.2d 168, 171 (Iowa 1990).

■ When considering a motion for directed verdict or for judgment notwithstanding the verdict, the district court must view the evidence in the light most favorable to the party against whom the motion is directed. This is so regardless of whether the evidence was contradicted. In addition such party is entitled to every reasonable inference from the evidence. Finally, if reasonable minds could differ on the issue, it is proper to submit it. *Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 283 (Iowa 1981).

In reviewing the district court's ruling on such motions, we also view the evidence the same way. Simply put, we ask, was there sufficient evidence to generate a jury question? *Johnson*, 451 N.W.2d at 171.

In its motions for directed verdict and judgment notwithstanding the verdict, FLB argued that the Woods received all of the consideration promised to them—$76,500.

In contrast, the Woods contended that the money was not the total consideration. Part of the consideration—they urged— was that FLB would in fact through its mortgage have a valid "first security position" on the farm. And—they continued— in the event of default FLB would look first to the farm rather than to them personally. Because—they concluded—FLB did not have a valid first security position on the farm, there was a partial failure of consideration by FLB.

The Woods' argument to the district court—and to us—is really this. FLB should have made sure that the Woods were fee owners of the farm before taking the mortgage from them. Because the Woods' interest in the farm was less than a fee simple estate (full ownership), FLB would realize considerably less in the event of a default on the note and foreclosure of the mortgage. In these circumstances FLB would look to the Woods for any deficiency. Because FLB did not make sure that it took a mortgage on a fee simple estate, this constituted a partial failure of consideration.

Our analysis must begin with a definition of "consideration." This court has defined consideration as "a benefit to the promisor or a loss or detriment to the promisee." *Test v. Heaberlin*, 254 Iowa 521, 523, 118 N.W.2d 73, 74 (1962). The Iowa uniform jury instructions give this expanded definition:

> "Consideration" is either a benefit given or to be given to the person who makes the promise [or some other person] or a detriment experienced or to be experienced by the person to whom the promise is made [or some other person]. Where the contract provides for mutual promises, each promise is a consideration for the other promise.

II Iowa Civil Jury Instructions 2400.4 (1986).

■ Promissory notes are generally described as contracts. So, fundamental rules governing contract law apply in determining legal questions about such instruments, except as modified by statute. *Hart v. Hart,* 160 N.W.2d 438, 444 (Iowa 1968). Such legal questions include whether there is a lack or a failure of consideration.

■ There is a substantive difference between *lack* of consideration and *failure* of consideration. A lack of consideration means no contract is ever formed because no consideration exists or none was intended to pass. *Johnson,* 451 N.W.2d at 172; *Hart,* 160 N.W.2d at 444.

In contrast, a failure of consideration means the contract is valid when formed but becomes unenforceable because the performance bargained for has not been given. *Johnson,* 451 N.W.2d at 172; *Hart,* 160 N.W.2d at 444. In *Johnson* we described in detail what failure of consideration could encompass and what remedies were available because of it:

> Failure of consideration covers every case where a contractual obligation is not performed irrespective of the fault of the breaching party. Thus, a failure of consideration may describe nonperformance which does not constitute a breach. A failure to render a promised performance may not be a breach of contract for the reason that performance has become impossible without fault; but is nonetheless a failure of consideration discharging the other party from his duty to perform under the contract, giving him the right to the restitution of payments already made or other benefits conferred.

*Johnson,* 451 N.W.2d at 172.

■ Failure of consideration can be total or partial. *Hart,* 160 N.W.2d at 444. A partial failure of consideration occurs when "only a part or portion of the consideration originally contemplated by the parties actually moved from obligee to obligor." *Id.* A total failure of consideration, on the other hand, happens when a party has "failed or refused to perform a substantial part of what the party agreed to do." *Johnson,* 451 N.W.2d at 172.

Our statutes recognize both. *See* Iowa Code §§ 537.3 (1973) (as to contracts generally) (now codified at section 537A.3); 554.-3408 (as to commercial paper).

■ The Woods had the burden to prove partial failure of consideration. This is so because of Iowa Code sections 537.2 (now codified at section 537A.2) and 537.3. Section 537.2 declares that all written contracts signed by the party to be bound shall import a consideration. And section 537.3 makes partial failure of consideration a defense. *See Chase Inv. Co. v. Kramer,* 243 Iowa 1369, 1372, 55 N.W.2d 467, 468 (1952). If there is substantial evidence to support the Woods' position on this issue, then the district court correctly submitted it. Absent such evidence it was error to do so.

Here the critical documents are the note and mortgage. Applying the definition of consideration to these documents, we must determine three things. First, what benefit to the Woods (the promisors) did the parties originally contemplate? Second, what detriment to FLB (the promisee) did the parties originally contemplate? Last, did any such benefit to the Woods or detriment to FLB in either document fail to materialize?

The pertinent language in the mortgage and note bearing on the first two questions is this:

### The Mortgage

Donald J. Woods and Lola Jean Woods, husband and wife ... *in consideration of the advance of the principal sum recited in the note* hereinafter described, *receipt of which is acknowledged,* hereby mortgage and convey to [FLB] mortgagee, ... the following described real estate [the farm].

. . . .

*This mortgage is given to secure a promissory note of even date herewith, executed by mortgagors to mortgagee, in the principal sum of seventy-six thousand five hundred and no/100—— dollars....*

*The Note*

*For value received, I/we* jointly and severally, as principals, *promise to pay to [FLB] ... the principal sum of seventy-six thousand five hundred and no/100——dollars....*

(Emphasis added.)

As the documents clearly show, the detriment to FLB originally contemplated by the parties is the $76,500 loan. The benefit to the Woods is the receipt of the $76,500.

The mortgage has no language suggesting that it—the mortgage—was a detriment to FLB originally contemplated by the parties. On the contrary, the mortgage language clearly states the mortgage is given by the Woods to secure the note.

In addition, the mortgage language suggests that the Woods warranted good title to FLB:

The mortgagors, and each of them, hereby warrant that they are fee owners of the mortgaged real property....

The testimony of Lola Jean Woods is consistent with the language in the two instruments. It also belies the Woods' claim that the parties originally contemplated additional consideration in the form of a valid first security position on the farm through the mortgage. Lola Jean testified in response to questions from her own attorney that her sole purpose in filling out the loan application was to obtain a loan from FLB. She also testified as follows about her purpose in going to FLB:

Q. You went to the Federal Land Bank to obtain some money to complete this real estate transaction, is that fair? A. Yes.

Q. What were you looking for when you went to the Federal Land Bank? A. Money.

Viewing the evidence in the light most favorable to the Woods, we find nothing in the record suggesting that the parties expected FLB to give the Woods anything more than the loan of $76,500.

What the Woods suggest is directly contrary to the way loans and mortgages are ordinarily handled. *See, e.g., Federal Land Bank v. Fetner,* 269 Pa.Super. 455, 410 A.2d 344 (1980). In *Fetner,* the appel-lant had borrowed money from the appellee-bank to buy a farm. The appellant was to execute and deliver to the bank a purchase-money mortgage on the farm. At the time of the loan closing, a third-party held an easement over a portion of the farm. Eventually the appellant fell behind in his payments and the bank foreclosed. On appeal of the foreclosure judgment, the appellant claimed, among other things, that the bank had a duty to tell him about the easement. The court disagreed, saying:

There is no basis for appellant's conclusion that the bank or its mortgage procuring agent had any duty to search out defects in the title and disclose them to the appellant. Ordinarily, the relationship between the borrower and lender does not create a confidential relationship.

*Id.* at 461, 410 A.2d at 348.

In *Fetner* the court articulated the respective obligations of the parties in a mortgage transaction:

*Ordinarily, there is no duty on the part of a lender to inspect the mortgaged property to determine that the borrower is obtaining that which he may have been promised by the vendor or that which he believes he is obtaining.* Unless some further obligation is assumed, *the lender's inspection of the premises to be mortgaged is made only to ascertain whether the property has sufficient value to secure the loan and is made by the lender for its benefit only.*

Appellant did not contract with the bank to review the title; he did not advise the bank that he intended to rely on its inspection of the property; and no duty existed in law for the bank to learn of or disclose any matter which appellant might deem a defect. If appellant was defrauded by the ... easement of which he avers he was unaware, the deception was not perpetrated by the bank and appellant's remedy must be sought elsewhere.

*Id.* (emphasis added). Simply put, the mortgage is for the benefit of the bank, not the borrower. If the bank chooses not to

be concerned about the value of the collateral or the validity of the borrower's interest in the collateral, that is a risk the bank takes. The borrower cannot complain.

Here there is no record evidence that the parties contemplated anything out of the ordinary in the way this transaction was to be handled. The Woods knew the Mosers were making some claim even before FLB did. The Woods attempted to protect themselves from this potential claim in their offer to the Schmitts' trustee. They did so by inserting a provision in the offer that would allow them a return of their money if the Schmitts did not secure title to the farm.

In addition, the Woods hired their own attorney to examine the abstract, and he raised questions about the Mosers' claim. The sale closed because the Woods' attorney assured them that title to the farm was marketable. The Woods relied on their own attorney, not on FLB. Ultimately the Woods recovered judgment against their attorney for breach of contract in connection with his title examination and his representation of the Woods in the real estate closing. *Moser V*, 439 N.W.2d at 863–64. And they also recovered a default judgment against the Schmitts because the Schmitts had warranted title. *Id.* at 861.

There is no evidence that the Woods contracted with FLB to examine the abstract of title for them. To the contrary, FLB told the Woods they should have their own attorney do so. FLB did have its attorney examine title but that attorney's opinion was directed to FLB and not to the Woods.

On this record we find that reasonable minds could reach just one conclusion: the *only* consideration flowing from FLB to the Woods was the $76,500 loan and the Woods received it.

Indeed, there was a failure of consideration. But FLB was not responsible for that failure; the Woods were. And that consideration was one owed by the Woods to FLB. The Woods had warranted in the mortgage that they were fee owners of the farm. As it turns out, they were not.

The district court should have sustained FLB's motions for directed verdict and judgment notwithstanding the verdict on the partial failure of consideration defense. The court's failure to do so was error.

IV. *Unjustifiable Impairment of Collateral.*

■ In their cross-appeal, the Woods challenge the district court's finding that their defense of unjustifiable impairment of collateral was not available. In short, the Woods claim FLB unjustifiably impaired the collateral—the farm—by not making sure that the Woods had a fee simple estate before loaning the money and taking the note and mortgage. As we noted earlier, the Woods used this same argument to support their partial failure of consideration defense.

The Woods rely on Iowa Code sections 554.3601(1)(d) and 554.3606(1)(b). Those sections provide:

Section 554.3601. *Discharge of parties.*

1. The extent of the discharge of any party from liability on an instrument is governed by the sections on

. . . .

d. impairment of right of recourse or of collateral (section 554.3606).

Section 554.3606. *Impairment of recourse or of collateral.*

1. The holder discharges any party to the instrument to the extent that without such party's consent the holder

. . . .

b. unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

The short answer to the Woods' claim is that FLB did not impair the collateral. The collateral was impaired before FLB took its mortgage. The impairment—defect in title—did not arise because of anything FLB did or failed to do.

In addition, the note itself is a consent for the release of any party and any part of the collateral. On this point the note provides:

Each of the persons signing this note hereby binds his or her separate estate, existing at the date of this note or here-

after acquired, for the payment of this note, and agrees that *any release of the security,* or of any person liable hereon *shall not operate as a release of any other signer,* endorser, surety, or guarantor of this note.

(Emphasis added.)

Finally, according to the Woods' own pleadings, this defense is predicated on FLB's *duty* to make sure the Woods would own the farm in fee simple. There was no such duty under the evidence in this record. The Woods—not FLB—had a duty to make sure they would have full ownership of the farm before they executed the note and mortgage. The Woods expressly warranted in the mortgage that they were the fee owners of the farm.

For all these reasons, we find no merit in the Woods' challenge to the district court finding on this issue.

## V. *Expert Testimony About Violations of the Federal Farm Credit Act.*

■ Another issue raised by the Woods' cross-appeal centers on the district court's refusal to admit certain testimony from the Woods' expert, a lawyer. The Woods were attempting to predicate a negligence claim on alleged violations of the Farm Credit Act of 1971, more specifically, 12 U.S.C. section 2001 et seq. (1975). According to this provision, all loans originated or participated in by a federally chartered corporation like FLB "shall be secured by first liens on interests in real estate" used as collateral. 12 U.S.C. § 2017 (1975) (now codified at 12 U.S.C. § 2018 (1988)). The Woods wanted their expert to testify that (1) FLB did not have a first lien and (2) because it had no first lien, FLB violated the statute.

We think the district court properly refused to admit this testimony for several reasons.

First, the Woods were seeking a legal conclusion from the expert. Legal conclusions are peculiarly for the court to decide and not the jury. Preliminarily, the court decides whether a statute imposes a duty, the breach of which imposes liability for damages. If the court concludes there is such a duty, the court instructs on it and the jury determines whether the duty was breached.

Second, borrowers do not have an implied right of action for damages under the Farm Credit Act. Nor does violation of federal regulations under the Act give rise to a separate cause of action under state tort law. *Production Credit Ass'n v. Ista,* 451 N.W.2d 118, 123–24 (N.D.1990) (reviewing a long line of cases, federal and state, holding that there is no implied right of action for violation of the Farm Credit Act).

Last, FLB did not violate the express terms of the Act. FLB had a valid first lien against the Woods' interest, albeit such interest was less than a fee simple estate.

## VI. *Attorney Fees.*

■ That brings us to the last issue. In its appeal, FLB contends the district court erred when the court refused to award it attorney fees. This was the court's reasoning:

The note on which this action rests does include a provision which states "reasonable attorney fees may be collected as a part of this indebtedness in any legal proceeding brought to enforce the collection...." Under normal circumstances, an award of attorney fees would be appropriate with respect to the Bank's action to enforce the note. However, in this case the jury found in favor of the affirmative defense raised by the Woods and they were justified in contesting the Bank's action to enforce the note. Under these circumstances, it would be impossible to determine what part, if any, of the Bank's attorney fees were *reasonably* necessary to obtain payment of the note. It is concluded that where, as here, a person successfully defends himself as to a substantial portion of the payee's action on a note, the provisions in the instrument for payment of attorney fees by the borrower are no longer valid.

We pass on the question whether the district court should deny attorney fees completely when there has been a successful partial defense against the note. We

do so because under the result we reach here, there has been no successful partial defense. FLB is entitled to recover the full amount of the note. In these circumstances, FLB is entitled to attorney fees for legal services in establishing its own claim and in defending against the counterclaims and affirmative defenses.

In addition, we agree with FLB that it is entitled to appellate attorney fees because the attorney fee language in the note does not prohibit such fees. *See Banker's Trust Co. v. Woltz,* 326 N.W.2d 274, 278 (Iowa 1982).

We reject the Woods' contention that the award of attorney fees must be governed by the version of section 625.22 in effect when the note was signed (1975), rather than the version in existence at the time of judgment (1990). (The 1975 version allowed attorney fees based on a graduated percentage of the judgment. The 1989 Code simply allows "a reasonable attorney's fee.") The Woods' contention is directly contra to what we held in *Woltz:*

> [T]he right to attorney fees and costs ... depends upon the statute in force at the termination of the proceedings.... [N]o party is entitled to costs *until a judgment is recovered.*

*Woltz,* 326 N.W.2d at 278 (emphasis added).

We must remand this case to the district court. On remand the district court shall hold an evidentiary hearing on trial and appellate attorney fees. In addition the district court shall fix those fees. We note that FLB waives attorney fees for proceedings in this case before March 1987 because of a change in counsel. It asked the trial court to allow fees from March 1987 through October 26, 1989. So as to trial court attorney fees the district court should use this time frame.

### VII. *Disposition.*

The district court erred when it denied FLB's motions for directed verdict and judgment notwithstanding the verdict on the Woods' defense of partial failure of consideration. The court also erred in not awarding FLB reasonable attorney fees.

We therefore reverse the judgment of the district court reducing FLB's recovery on the note by the amount of the set-off. We also reverse the judgment denying FLB attorney fees.

Because it appears that material facts relating to the partial failure of consideration defense were fully developed at the trial, we think the "ends of justice would not be served by awarding a new trial." *In re Estate of Klein,* 241 Iowa at 1119, 42 N.W.2d at 602. We therefore remand this case to the district court which shall enter judgment for FLB as if either motion had been sustained. In addition, the court shall enter judgment for FLB against the Woods for the full amount of the note and interest. Finally, following an evidentiary hearing, the court shall fix trial court attorney fees as well as appellate attorney fees.

The district court correctly found against the Woods on their defense of unjustifiable impairment of collateral. The court also properly excluded the expert's opinion about the Farm Credit Act. We therefore affirm on the Woods' cross-appeal.

The parties raised other issues and arguments. We have carefully considered them but find that they are either moot or lack merit.

Costs are taxed to the Woods.

REVERSED ON THE APPEAL AND REMANDED WITH DIRECTIONS; AFFIRMED ON THE CROSS–APPEAL.