# IN THE COURT OF APPEALS OF IOWA

No. 15-1433
Filed September 28, 2016

**FIRST AMERICAN BANK,**
    Plaintiff-Appellee,

**vs.**

**MIDWEST CREAMERY, INC., d/b/a COLD STONE CREAMERY, f/k/a CS CREAMERY, INC.; SCOTT OTIS; JANET OTIS; and JRF, INC.,**
    Defendants-Appellants.
_____

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

Midwest Creamery appeals a district court order granting judgment on three promissory notes and a supplemental order awarding attorney fees. **AFFIRMED.**

Andrew B. Howie of Hudson, Mallaney, Shindler & Anderson, P.C., West Des Moines, for appellants.

Christopher K. Loftus, Lynn W. Hartman, and Dawn M. Gibson of Simmons Perrine Moyer Bergman, P.L.C., Cedar Rapids, for appellee.

Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

Midwest Creamery,[1] an Iowa corporation operating Cold Stone Creamery ice cream franchises, appeals a district court order granting judgment in favor of First American Bank on three promissory notes and a supplemental order awarding attorney fees. Midwest Creamery contends the district court erred in (1) finding default under the promissory notes, (2) awarding damages on the entire third promissory note, and (3) granting excessive attorney fees.

We find substantial evidence to support the district court's finding of default under the promissory notes as well as its determination First American was entitled to collect the entire amount due on the third note. Although the attorney-fee award was substantial, in considering the complexity of the litigation, we find no abuse of discretion in the award. Moreover, we find First American's counsel is entitled to recover appellate attorney fees.

## I.     Background Facts and Proceedings

On October 9, 2003, CS Creamery, Inc. borrowed $500,000 from First American and executed two promissory notes (Note 1 and Note 2), each in the amount of $250,000. The promissory notes were unconditionally guaranteed by JRF, Inc., the holding company of CS Creamery, and Scott and Janet Otis, the sole shareholders of JRF. At this time, CS Creamery also authenticated a security agreement granting First American an interest in its assets. The parties modified the notes more than once in the next several years. Although the modification agreements referenced the original notes, they listed Midwest

---

[1] Guarantors Scott Otis, Janet Otis, and JRF, Inc. are also parties to this action. For ease of reference, we will use "Midwest Creamery" throughout this opinion to refer to the defendants-appellants collectively.

Creamery, Inc., a corporation under the same ownership as CS Creamery, as the debtor rather than CS Creamery.

A little under two years later, Midwest Creamery borrowed $475,000 from First American and executed a promissory note (Note 3) in that amount. Again, the Otises and JRF unconditionally guaranteed the note. Note 3 indicated its guaranteed portion had been sold to a registered agent for value. Midwest Creamery authenticated a security agreement granting First American an interest in some of its assets but excluding "equipment and machinery."

Over the next several years, Midwest Creamery was frequently tardy in its payments on the notes, periodically drifting between thirty and sixty days past due. Midwest Creamery also failed to provide annual financial statements and tax returns in accordance with the terms of the notes. Beginning in 2012, the delinquency worsened, and Midwest Creamery fell perpetually behind in its payments. Rather than declare Midwest Creamery in default, First American continued to accept the late payments to allow Midwest Creamery to "work through" its financial problems. In correspondence between the parties, First American emphasized the importance of keeping the account under sixty days past due.

Midwest Creamery's financial difficulties worsened. By April 2014, the IRS had filed several tax liens against Midwest Creamery, and the landlord of its Johnston ice cream store location had locked Midwest Creamery out of the property and initiated a lawsuit, alleging delinquency in rental payments. Although Midwest Creamery and First American worked together to resolve the

tax-lien issue, Midwest Creamery failed to inform First American of the lockout. Only in the course of a routine site visit did First American discover the lockout.

On April 16, 2014, First American declared default and accelerated the remaining amounts due on all three notes, demanding full payment within seven days. Midwest Creamery failed to make any payments after receiving the demand letters, and First American filed suit on April 25 to foreclose its security agreements and obtain a monetary judgment. First American's petition alleged Midwest Creamery was in default for failure to pay in accordance with the terms and conditions of the notes. The petition further alleged eight additional grounds of default, including failure to disclose material facts to the lender. After a bench trial in which First American pursued only a judgment for the remaining balance due on the notes, the district court ruled in favor of First American, listing several grounds of default. Shortly thereafter, the district court awarded $81,446.72 in attorney fees to First American. Midwest Creamery appeals both orders.

## II.    Scope and Standards of Review

We find this case was tried at law, and we review for errors of law. *See* Iowa R. App. P. 6.907; *see also Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 178–79 (Iowa 2010). The district court's fact-findings carry the weight of a special verdict, and if substantial evidence supports those findings, they are binding on us. *Van Sloun*, 778 N.W.2d at 179. But we are not bound by the district court's conclusions of law. *Id.*

We review a grant of attorney fees for an abuse of discretion. *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 469 (Iowa 2010).

We will reverse only if the district court based "its ruling on grounds that are clearly unreasonable or untenable." *Id.*

**III.    Analysis**

**A.    Did First American prove Midwest Creamery was in default?**

The district court determined Midwest Creamery had defaulted by failing to make timely payments on the promissory notes,[2] and on additional grounds: (1) by failing to provide annual financial statements and tax returns; (2) by failing to pay taxes when due; and (3) by falling behind on rent payments to the extent of being locked out of a business location, a circumstance implicating multiple grounds of default.  Midwest Creamery contends First American waived its right to accelerate on the grounds of failing to make payments when due and failing to pay taxes.  We find it unnecessary to reach the issue whether First American waived its right to accelerate on the grounds of late payments and failure to pay taxes because we find substantial evidence in the record supporting Midwest Creamery's default on the other grounds identified by the court.

Midwest Creamery argues the record does not support the district court's findings of additional grounds of default.  Midwest Creamery first challenges the sufficiency of the demand letters sent by First American, highlighting the fact that the letters did not specifically mention any grounds of default other than the failure to make timely payments.  Midwest Creamery claims because First American "invented these bases for default after it decided to accelerate the note," the district court should not have found Midwest Creamery in default.

---

[2] The notes have identical provisions concerning default.

On April 16, 2014, First American sent Midwest Creamery demand letters regarding each of the three promissory notes stating "[t]he above loan is in default which default includes but is not limited to payment default and default under lease and franchise agreements" and accelerating Midwest Creamery's obligations under the notes to become due within seven days of the notice. After failing to receive any payments from Midwest Creamery, First American filed suit on April 25, listing nine grounds of default.

The terms of the notes allowed First American, without providing notice or demand, to accelerate the balance upon default or to file suit. In *Dunn v. General Equities of Iowa, Ltd.*, our supreme court noted acceleration provisions are not self-executing but rather require the holder "take some positive action to exercise his option to declare payments due under an acceleration clause." 319 N.W.2d 515, 516 (Iowa 1982) (quoting *Weinrich v. Hawley*, 19 N.W.2d 665, 667 (Iowa 1945)). First American took that affirmative action to exercise its option in the April 16 demand letters.

Midwest Creamery complains the demand letters were "silent as to why the bank chose to accelerate the notes. There was no mention of unpaid taxes, impaired collateral, a dispute with the landlord, or the failure to provide financial information." But Midwest Creamery does not cite, nor do we find, any authority requiring First American to provide a notice to cure in these circumstances, specifically listing all grounds of default despite the express contrary terms of the notes. *See* Iowa Code § 554.9601(4) (2013) (stating debtor has the rights provided in the agreement of the parties upon default). Iowa law does provide a debtor the right to notice of default in certain circumstances. *See, e.g.*, Iowa

Code § 537.5110 (providing consumer the right to notice of alleged default and right to cure in consumer credit transactions); *id.* § 654.2D (giving borrower a right to notice of alleged default and right to cure for mortgage of a homestead). But this is not a consumer credit or homestead transaction. In this commercial credit situation, we find First American's letters invoking the acceleration clause were sufficient.

Midwest Creamery next argues First American did not prove Midwest Creamery defaulted in failing to provide financial documents in accordance with the notes and directs us to conflicting testimony on the issue. Mark Lyons, chief credit officer at First American, testified financial documents from Midwest Creamery were missing from First American's file, while Steven Phipps acknowledged only that First American generally received Midwest Creamery's financial documents late and stated he would "have to look at the files to see if [First American] ever received" them. Scott Otis testified he had eventually produced all financial documents for Midwest Creamery. Otis indicated due to the time constraints of his CPA, he was unable to provide the financial information by the deadlines in the notes, but First American knew of the problem and told him the delay was acceptable.[3]

In concluding Midwest Creamery had defaulted on this ground, the district court stated: "Midwest Creamery was regularly tardy in supplying the business records and tax returns it is required to provide to First American under the terms of the Notes. Some of the documents were never supplied." We agree Midwest

---

[3] Despite First American's alleged representations to Otis, Midwest Creamery does not argue First American waived its right to accelerate on this ground.

Creamery was in default for failing to provide financial statements in accordance with the terms of the notes. Although the record contained conflicting testimony whether Midwest Creamery had completely failed to provide certain financial documents, no dispute existed that Midwest Creamery failed to provide the financial documents within the time periods required by the notes. Therefore, we affirm on this ground.

Midwest Creamery also argues the lockout by its landlord in Johnston did not place it in default. The district court found Midwest Creamery in default on several grounds due to the lockout and resulting legal proceedings: (1) failing to preserve or account for collateral, (2) failing to disclose material facts to First American, (3) becoming subject of a civil or criminal action First American believed could materially affect its ability to pay, (4) defaulting on loans and agreements with other creditors to the extent First American believed it could materially affect its ability to pay, and (5) having an adverse change to financial condition and business operation First American believed could materially affect its ability to pay.

Citing the fact that CS Creamery rather than Midwest Creamery executed the first two promissory notes and subsequent grant of security interests in its equipment, Midwest Creamery argues First American did not have a security interest in the equipment at the location of the lockout and, therefore, Midwest Creamery had no duty to inform First American of the lockout because it was not a "material fact"—First American had no danger of losing collateral. Midwest Creamery also maintains "[b]eing subject to a civil proceeding is insufficient to be found in default because then, any lawsuit, from a 'slip and fall' case brought by a

patron could be used to declare Midwest Creamery in default." Lastly, Midwest Creamery contends that even if we find it was in default, First American waived its right to declare default by failing to act on its knowledge of the lockout for several months.

We find it unnecessary to address whether First American had a security interest in the equipment at the location of the lockout because substantial evidence supports the other grounds of default found by the district court. At the time First American discovered the lockout, Midwest Creamery's financial difficulties were readily apparent. Midwest Creamery had been chronically behind in its payments for two years and was subject to tax liens. Because of these pre-existing financial concerns, First American was justified in believing the lockout—which prevented Midwest Creamery from doing business at one of its locations, arose from delinquency in rent payments, and resulted in litigation— materially affected Midwest Creamery's ability to pay on the notes.

Finally, Midwest Creamery's waiver claim concerning the lockout is without merit. A party may waive its rights under a contract, including the right to accelerate. *Dunn*, 319 N.W.2d at 516. A pattern of actions or omissions such as failing to accelerate a debt may constitute a course of performance[4] "sufficient to establish waiver" of the option to accelerate. *See id.* at 517. We fail to see how

---

[4] The *Dunn* court uses the phrase "course of dealing" rather than "course of performance." 319 N.W.2d at 517. But in many references, "course of performance" is the term used to describe "a sequence of conduct between the parties to a particular transaction," which would encompass prior acceptance of delinquent installments in a single transaction. *See* 13 *Williston on Contracts* § 39:30 (4th ed. 2015) (noting that by "regularly accepting late payments" a lender may establish waiver by "course of performance"). *Compare* Iowa Code § 554.1303(1), *with id.* § 554.1303(2).

First American waived its right to accelerate on grounds related to the lockout.[5]

Any delay between First American's discovery of the lockout and its declaration

of default was minimal and not enough to constitute waiver.[6]  *See In re Prop.*

*Seized from Sykes*, 497 N.W.2d 829, 833 (Iowa 1993) ("Mere passivity may not

support a waiver.").  Therefore, we affirm on this ground.

**B.** **Was First American required to provide written evidence it had repurchased the guaranteed portion of Note 3 to obtain judgment on the entire balance of the note?**

In the event we find First American proved Midwest Creamery defaulted

under the notes, Midwest Creamery asks us to limit the bank's recovery on Note

3.  The face of Note 3 indicated the guaranteed portion of the note had been sold

for value.  At trial, First American representative Mark Lyons testified the loan

First American issued to Midwest Creamery was guaranteed in part by the Small

Business Administration (SBA), which allowed First American to sell the

guaranteed portion—seventy-five percent of the loan—to an approved third party.

Lyons continued that in accordance with SBA procedure, once Note 3 first went

into default in 2011, First American repurchased the guaranteed portion from that

third party.  Although First American was prepared to produce all of the original

promissory notes at trial, it was unable to provide any written documentation of

its agreement to repurchase Note 3.

---

[5] The notes contained anti-waiver provisions, which stated: "Lender may delay or forgo enforcing any of its rights without giving up any of them."  Because we find Midwest Creamery failed to prove waiver, we decline to consider the effect the anti-waiver provisions would have on Midwest Creamery's waiver claim.

[6] At trial, Lyons was unsure of when First American became aware of the lockout, stating he would need to review his notes and it was likely in "January or February of 2014." But Phipps, the First American employee who actually performed the site visit, testified he discovered the lockout in March, approximately one month before First American declared default.

Midwest Creamery argues First American was not entitled to judgment on the entirety of Note 3 because First American failed to provide written evidence it had repurchased the SBA-guaranteed portion of the note. Midwest Creamery contends the verbal testimony regarding the repurchase of the previously sold portion from First American representative Mark Lyons was not competent evidence, hearsay, and violated the parol evidence rule. Thus, according to Midwest Creamery, First American's recovery on Note 3 must be limited to twenty-five percent—the portion of the note it did not sell—of the unpaid balance.

First American contends it remained the holder of Note 3 under Iowa's Uniform Commercial Code and retained the right to enforce the note in its entirety because it sold only a portion of the note to a third party. *See* Iowa Code § 554.3203(4). First American further contends it did, in fact, repurchase the previously sold portion as Lyons testified, and First American owned the entire note at the time of trial. Finally, First American points out that it surrendered the original note to the court before the judgment was docketed, proving it was the owner of the note.

We find substantial evidence supports the district court's conclusion First American owned all of Note 3 and was entitled to enforce it. The holder of a promissory note, which includes an entity in possession of a note payable to it, has the right to enforce the note. *Id.* §§ 554.1201(2)(u), .3301. Here, although First American transferred a portion of Note 3, it retained possession of Note 3 as well as all rights and responsibilities associated with it—First American remained the payee under the loan and kept all servicing responsibilities. *See id.* § 554.3203(4) ("If a transferor purports to transfer less than the entire instrument,

negotiation of the instrument does not occur. The transferee obtains no rights under this Article and has only the rights of a partial assignee."). And even if the partial transfer had granted a third party rights in the note, the testimony of Lyons at trial and First American's subsequent surrender of the original note to the court before entry of judgment indicated First American had repurchased the transferred portion by the time of trial. Midwest Creamery does not cite, nor do we find, any case law requiring First American to provide written proof of its repurchase, and because the evidence presented at trial demonstrated First American remained the holder of the note throughout the course of the loan, we decline to require written proof over and above the original promissory note. *See Grimes Sav. Bank v. McHarg*, 213 N.W. 798, 799 (Iowa 1927) (noting production of original note by payee sufficient to establish a prima facie case of ownership).

Moreover, we are not persuaded by Midwest Creamery's evidentiary objections. Midwest Creamery contends Lyons was not competent to testify to First American's alleged repurchase of Note 3 because his testimony was "self-serving." But testimony is not inadmissible on grounds of competency simply because it is self-serving. *See* Iowa R. Evid. 5.601 ("Unless otherwise provided by statute or rule, every person is competent to be a witness."); *see also* Fed. R. Evid. 601 advisory committee's note ("Interest in the outcome of litigation . . . require[s] no special treatment to render [it] admissible . . . .").[7] Midwest

---

[7] We find the case cited by Midwest Creamery in support of this argument, *In re Vargas*, 396 B.R. 511 (Bankr. C.D. Cal. 2008), to be readily distinguishable. The *Vargas* court found a low-level clerk was not competent on grounds of lack of personal knowledge to testify as a records custodian when there was no indication of how he had "custody of any books, records or files of [the company], or . . . any connection" to the company. 396 B.R. at 515. But here, there was no question that either of the First American representatives who testified at trial had personal knowledge about the promissory

Creamery also argues the testimony is hearsay but does not point to any specific objectionable language. We fail to see how a First American representative's testimony that First American repurchased Note 3 involves an out-of-court statement implicating the hearsay rules. Finally, Midwest Creamery urges us to find Lyons's testimony in violation of the parol evidence rule "as it seeks to modify the written language of Note 3." Again, we find Midwest Creamery's argument unavailing. The parol evidence rule does not apply to subsequent modifications of a written contract. *See Whalen v. Connelly*, 545 N.W.2d 284, 291 (Iowa 1996).

Accordingly, we affirm the district court's judgment on the entire balance of Note 3.

## C. Did the district court abuse its discretion in the amount of attorney fees it awarded to First American?

Midwest Creamery's last challenge is to the district court's grant of attorney fees. In its decision granting judgment to First American, the district court found First American was "contractually entitled" to recover reasonable attorney fees and expenses. First American subsequently filed an application for attorney fees, seeking $85,146.72. After a hearing on the matter, the district court granted attorney fees and expenses in the amount of $81,446.72.

Midwest Creamery argues the district court abused its discretion in the amount of attorney fees it awarded to First American because (1) the award included amounts for time spent before First American declared default and (2) the complexity of the case did not warrant such an "exorbitant" amount of

notes. Both were relatively high-level employees of First American who worked extensively on the matter.

fees. First American counters that the award correctly included fees and expenses beginning in 2011 because the notes expressly allowed attorney fees to enforce the notes and to protect collateral, regardless of whether those fees occurred before or after First American declared default. First American contends the amount of the award was appropriate considering the extensive efforts of First American's counsel and the intricacy of the case.

**1. May the attorney-fee award include amounts accrued before First American declared default?**

Without citation to authority, Midwest Creamery argues First American should not be able to recover any attorney fees and expenses incurred before First American declared default in 2014. A party may generally recover reasonable attorney fees "[w]hen judgment is recovered upon a written contract" that includes an express attorney-fee provision. Iowa Code § 625.22; *see also NevadaCare, Inc.*, 783 N.W.2d at 469–70. In construing such a provision, we look to the plain meaning of the language. *See Palo Sav. Bank v. Sparrgrove*, No. 02-1234, 2004 WL 57466, at *3 (Iowa Ct. App. Jan. 14, 2004); *see also Fed. Land Bank of Omaha v. Woods*, 480 N.W.2d 61, 66 (Iowa 1992). According to the terms of the notes, First American was entitled to:

> Without notice and without Borrower's consent . . .
> . . . .
> B.  Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include . . . reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance.

The district court found the legal "services provided before formal default was declared were reasonably necessary to preserve [First American's] security interest, a matter that is within the scope of the contractual agreement to pay attorney fees." We agree. The time and expense statements submitted by First American's counsel include research regarding priority of First American's security interest, drafting and revising a forbearance agreement, and negotiating lien waivers. The terms of the attorney-fee provision, which included expenses to enforce the terms of the notes and preserve collateral, were expansive enough to encompass this activity, so the district court was within its discretion in including the fees and expenses accrued before First American's formal declaration of default. *See Woods*, 480 N.W.2d at 69–70 (finding lender entitled to attorney fees "for legal services in establishing its own claim and in defending against the counterclaims and affirmative defenses" when provision stated "reasonable attorney fees may be collected as a part of this indebtedness in any legal proceeding brought to enforce the collection"); *Sparrgrove*, 2004 WL 57466, at *3 (finding attorney fee provision stating "if you hire an attorney *to collect this note*, I also agree to pay any fee you incur with such attorney plus court costs" allowed for fees incurred to establish right to recovery and defend against counterclaims but did not encompass fees incurred to defend its secured position against claims of third parties).

## 2.    Was the attorney-fee award unreasonable?

Under section 625.22, any attorney fee awarded must be reasonable. Midwest Creamery argues the fee award was unreasonably high considering "there was limited discovery, and it was a one-day trial that lasted approximately

6½ hours." Midwest Creamery challenges the amount of time First American's counsel spent and the number of attorneys who worked on the matter but not the hourly rate of the attorneys. "A reasonable attorney fee is initially calculated by multiplying the number of hours reasonably expended on the winning claims times a reasonable hourly rate." *Boyle v. Alum-Line, Inc.*, 773 N.W.2d 829, 832 (Iowa 2009) (quoting *Dutcher v. Randall Foods*, 546 N.W.2d 889, 896 (Iowa 1996)). Whether the hourly rate and time spent are reasonable depends upon the specific facts of each case. *Id.* In determining the amount of the award, the court must consider:

> (1) the time spent; (2) the nature and extent of the services; (3) the amount of money involved; (4) the difficulty of handling and importance of issues; (5) the responsibility assumed; (6) the results obtained; (7) the standing of the attorneys in the profession; and (8) the customary changes for similar service.

*Dutrac Cmty. Credit Union v. Hefel*, No. 15-0143, 2015 WL 7574230, at *9 (Iowa Ct. App. Nov. 25, 2015). Further, the district court may reduce an award for unreasonable time spent or duplicative hours. *Boyle*, 773 N.W.2d at 833. We consider the district court an expert in determining what constitutes a reasonable attorney fee. *See id.* at 832.

The district court specifically addressed Midwest Creamery's claim that the amount sought by First American was excessive:

> [T]hough the amount of the fee sought is in the high range for a case that is generically labeled a "collection" case, not all collection cases are the same. In the range of loan transactions, this one was a complicated, commercial loan transaction involving multiple notes, multiple security agreements, multiple guarantors, multiple business locations, and several years of close monitoring by the plaintiff and negotiation between the plaintiff, the defendant and the guarantors as the plaintiff became concerned about repayment.

The court also rejected Midwest Creamery's claim it was unnecessary to have as many attorneys working on the case as it did, noting First American "reduced its original fee claim by an amount equal to the fees attributable to the second attorney who participated in the trial."[8] The district court found no other duplication of services.

We agree with the district court's well-reasoned analysis. Although the trial itself was brief, the filings throughout the case and the statement of attorney fees demonstrate the complexity and difficulty of the matter as a whole. This case involved multiple guarantors and multiple lienholders. The fee statements disclose lengthy negotiations between the parties as well as summary judgment and post-trial briefing. Although discovery was limited, requests by Midwest Creamery required First American's counsel to review thousands of pages of documents. Therefore, we affirm the district court's grant of attorney fees in the amount of $81,446.72.

Finally, we find First American is entitled to appellate attorney fees "because the attorney fee language in the note does not prohibit such fees." *Woods*, 480 N.W.2d at 70; *see also Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 111 (Iowa 2011). We award First American $3000 in appellate attorney fees.

**AFFIRMED.**

---

[8] This reduced the original claim of $85,146.72 to $81,446.72—the amount ultimately awarded by the district court.